Eliseo Hernandez **MORENO**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69268.

Court of Criminal Appeals of Texas, En Banc.

May 28, 1986.

Larry P. Urquhart (court appointed on appeal), Brenham, for appellant.

James H. Keeshan, Dist. Atty., Peter C. Speers, III, Asst. Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(1). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071, V.A.C.C.P. Punishment was assessed at death. We affirm.

Appellant was convicted of intentionally and knowingly causing the death of Department of Public Safety officer Russell Boyd, while Boyd was in the lawful discharge of his official duty as a peace officer. Appellant raises nine grounds of error. He challenges the denial of his pre-trial motion to quash; the exclusion of four potential jurors; the admission into evidence, during the guilt/innocence phase of the trial, of several extraneous offenses; the trial court's denial of appellant's request for a jury charge on the lesser included offense of murder; the sufficiency of the evidence to support the jury's finding that Officer Boyd was in the discharge of his official duty when killed; and finally the sufficiency of the evidence to support the jury's affirmative finding to special issue number two. See Art. 37.071(b)(2), V.A.C.C.P.. Since appellant urges that the evidence is insufficient for both a finding of guilt and the jury's ultimate determination of future dangerousness, a detailed review of the facts is necessary.

Appellant was indicted for the capital murder of Texas Department of Public Safety Trooper Russell Lynn Boyd, alleged to have been committed on October 11, 1983. The evidence showed that on the date in question, the appellant, from 5:30

p.m. to 8:00 p.m., killed a total of six individuals in College Station and Hempstead before being captured in Wharton. In addition to the six murders, six other people were kidnapped and one robbed in order to facilitate appellant's escape.

When viewed in the light most favorable to the jury's verdict, the State's evidence shows that on October 11, 1983, Department of Public Safety (hereinafter DPS) Trooper Russell Lynn Boyd was on duty in the Hempstead area from 1:00 p.m. to 10:00 p.m. His duties involved the enforcement of traffic regulations on state highways. At approximately 6:30 p.m., William and Janie Norris were traveling southbound on Highway 6, approximately 10 miles north of Hempstead. They noticed a DPS "black and white" vehicle parked on the shoulder of the southbound lane immediately behind a maroon Ford. Janie Norris also noticed that the blue and red emergency lights were flashing. William Norris testified that it appeared to him that the DPS vehicle had stopped a speeder. As the Norrises approached the vehicle, they noticed a body, in uniform, lying on the grass between and to the right of the vehicles. As they got closer to the vehicles and slowed down, a man appeared from behind the DPS vehicle. The man waved at the Norrises, who immediately fled. The man then reached inside the DPS vehicle, removed a shotgun, and gave chase in the maroon Ford. The chase reached speeds exceeding 100 miles per hour. During the chase, Janie Norris noted a description of the driver of the vehicle, the vehicle itself and the license plate number, RPL 311. She was also able to recall the relative locations of the two vehicles and the body.

Upon entering Hempstead, the maroon Ford ceased its pursuit of the Norrises, who then proceeded to the Waller County Sheriff's Office, where they reported what had happened. At trial, both William and Janie Norris positively identified the appellant as the person who they saw next to the DPS vehicle and who pursued them into Hempstead in the maroon Ford.

Randy Smith is a probation officer for Waller County and knew the deceased. He arrived at the scene of the offense and identified the DPS officer as Russell Lynn Boyd. He also testified that Boyd's clipboard with ticket book, smashed hat, and watch were lying near the trooper's body on the ground.

Trooper Albert Sneed was Boyd's partner. He testified that on October 11, 1983 Trooper Boyd was on duty from 1:00 p.m. to 10:00 p.m. Sneed last saw Boyd at approximately 4:30 p.m., and at that time Boyd was on duty, dressed in his DPS uniform and wearing his badge. According to Sneed, Boyd carried a Smith and Wesson .357 Magnum blue steel revolver. Additionally, Boyd carried a Remington 870 shotgun in the front seat of the DPS vehicle.

Shortly after the above incidents, officers discovered a maroon Ford bearing license number RPL 311 abandoned at the La Casita Restaurant in Hempstead. On the front seat an officer found a "bank transaction paper" bearing the name Eliseo Moreno. Under the driver's seat an officer found two pistols—a .25 caliber automatic and a .22 caliber revolver. Several spent shells were found on the floorboard. Additionally, officers found the ignition key to Trooper Boyd's vehicle on the front seat.

Later that same evening at about 11:00 p.m., officers conducting a road block of the southbound lanes of U.S. Highway 59, just outside Wharton discovered appellant riding as a passenger in the front seat of a blue Ford Bronco. The driver of the Bronco testified that appellant told him he had shot a DPS officer earlier that day. Appellant was removed from the car and handcuffed. Inside the Bronco, officers found a Smith and Wesson .357 Magnum blue steel revolver, which was subsequently determined to be Trooper Boyd's DPS revolver. Also discovered was a Smith and Wesson .357 Magnum stainless steel revolver, later determined to be the murder weapon. Two bullets recovered from Trooper Boyd's bullet proof vest were determined to have been fired from the stainless steel revolver

found on the passenger side of the Bronco in which appellant had been a passenger. Further, spent cartridges recovered from the maroon Ford were proven to have been fired by the same stainless steel revolver.

The State established through competent medical testimony that Trooper Boyd suffered five gunshot wounds, dying as a result of a bullet wound which went through his arm and entered his chest. Additionally, one shot was fired from a range of 6 to 24 inches into Trooper Boyd's head, underneath his ear and through his neck, as he was lying on the ground.

In addition, the State offered numerous extraneous offenses into evidence. All the extraneous offenses were shown to have occurred both prior to the shooting of Trooper Boyd and immediately after the shooting in an attempt to avoid apprehension.

The State's evidence showed that, approximately 30 minutes before the Norrises discovered appellant and Trooper Boyd on Highway 6, appellant killed his brother and sister-in-law, Juan and Esther Garza, in College Station. Two witnesses positively identified appellant as the person they saw leaving the Garza's apartment immediately after the shooting. One witness, hearing "popping noises" and the Garza children screaming, went to the Garza apartment and there actually saw appellant shooting Juan Garza. Appellant followed the witness and threatened him with a pistol. The witness called the police and, after observing appellant flee, entered the apartment and observed the bodies of Juan and Esther Garza on the floor. Appellant was observed leaving the scene of these two killings in the same maroon Ford observed by the Norrises. Ballistics evidence showed that the bullets removed from Juan Garza were fired by the same weapon as the bullets removed from Trooper Boyd.

Another extraneous offense introduced was aggravated robbery of Genaro Cibrian. Cibrian testified that, at approximately 6:30 p.m. to 7:00 p.m. on the evening of October 11, 1983, he and his three children drove up to La Casita Restaurant in Hempstead in a green 1974 Ford. A person unknown to him drove up beside them. At gunpoint, Cibrian and his children were ordered from their car. The assailant then placed a pistol and shotgun in the car, and drove off in Cibrian's car, leaving his own car behind. Cibrian identified appellant as the person who took his car at gunpoint.

Through the testimony of Bill and Patricia Shirley, the State introduced yet another extraneous offense. The Shirleys both testified that appellant appeared at their home in Hempstead, on the evening of October 11, 1983 at about 6:30 to 7:00 p.m., driving an older model green Ford and ordered Bill Shirley at gunpoint to drive him to Houston. Patricia Shirley insisted on going with her husband. As a result, they both rode in their Oldsmobile with appellant to Houston. During the trip appellant admitted taking the shotgun and pistol "off of a DPS officer". Also during the trip, appellant threw the shotgun out the window. Near the intersection of Highway 610 and 225 in Pasadena, appellant got out of the Oldsmobile and left on foot. The Shirleys then drove part of the way back to Hempstead, stopping at a truck stop to report the incident to the police. Later that evening, Bill Shirley directed officers to the location where appellant discarded the shotgun. This shotgun proved to be the one carried by Russell Lynn Boyd in the DPS patrol car. The State further offered evidence from a fingerprint expert showing that appellant's prints had been found on Boyd's shotgun.

Finally, the State proved, during the guilt/innocence portion of the trial, one last extraneous offense committed by appellant on that same day. After being dropped off by the Shirleys, appellant then asked Ronald Gangle to drive him to the airport. Gangle agreed. On the way to the airport, appellant pulled out a pistol and ordered Gangle to drive him south on Highway 59 to Victoria. During the trip south, appellant told Gangle that he had killed a DPS trooper that same day and now had the trooper's pistol. At a road block near

Wharton, Gangle stopped, and appellant was arrested.

During the punishment phase of the trial, the State offered testimony which tended to prove that, in addition to the foregoing offenses, the appellant did, on October 11, 1983, murder three elderly people. The evidence showed that a Mr. and Mrs. Benatt and Allie Wilkins were killed by a young Mexican at about 7:00 p.m. in Hempstead. An older model green Ford was seen exiting the Benatt's driveway shortly after shots were heard. Prior to expiring, Mrs. Benatt was able to tell officers that a young Mexican man had come to the door and asked to leave his car in the driveway because it was running hot. For reasons not made clear in the record, the man opened fire, and shot all three of the elderly people. Mrs. Benatt died of her wounds several weeks later. The State established, through a ballistics expert, that a copper bullet jacket found by officers on a chair in the Benatt home had been fired by the stainless steel revolver recovered in the Bronco following appellant's arrest. Thus, the copper bullet jacket found in the Benatt's home and the bullets found in trooper Boyd were found to have been fired from the same weapon.

The State also offered evidence showing that the murder weapon, the .357 stainless steel revolver, had disappeared from a sporting goods store the day of the offense. The State also showed that appellant purchased two pistols the day of the offense.

An additional unrelated extraneous offense was offered into evidence by the State. The ex-husband of appellant's wife testified that appellant, in June of 1983, apparently without any provocation, assaulted him with a can of peanuts.

During the punishment phase of the trial, the appellant offered the testimony of several friends and his brother. They all described appellant as a good person who did not fight, threaten people, or carry a weapon. In addition, appellant's ex-wife testified that appellant was a good husband and good father to their three children.

The appellant further showed, through the testimony of a jailer, that he attempted suicide while awaiting trial on this cause.

Finally, appellant offered testimony of two expert witnesses, an alcoholism counselor and a clinical psychologist. The gist of their testimony was that appellant suffered from severe and chronic alcoholism and that his violent conduct was the direct result of his disease. The clinical psychologist, based on a complete psychological work-up, testified that appellant's actions were consistent with appellant's intoxication at the time of the commission of this offense and the related extraneous offenses. Both witnesses further testified that appellant would not, if prevented from drinking alcohol, constitute a continuing danger to society, and would not engage in violent conduct.

In ground of error seven, appellant asserts that the trial court erred in failing to grant his motion to quash the indictment. In his motion to quash, appellant alleged he was entitled to notice as to the facts upon which the State would rely to prove its allegation that Trooper Boyd was in the lawful discharge of his duties when killed. Appellant relies on *Thomas v. State*, 621 S.W.2d 158 (Tex.Cr.App.1981); *Kass v. State*, 642 S.W.2d 463 (Tex.Cr.App.1982); and *Gorman v. State*, 634 S.W.2d 681 (Tex.Cr.App.1982). Appellant acknowledges that a similar argument has been rejected by the San Antonio Court of Appeals in *Aranda v. State*, 640 S.W.2d 766 (Tex.App. —San Antonio 1982).

*Aranda*, supra, is, in the context of the motion to quash, indistinguishable from the case sub judice. There the defendant was charged with capital murder of a peace officer. Like the appellant here, the defendant in *Aranda* filed a motion to quash for failure to allege the specific acts of the peace officer which constituted his acting in the discharge of his official duties. *Aranda*, supra, at 770. The Court of Appeals rejected the defendant's claims, holding that it was "settled Texas law that it is the *defendant's* acts, not the victim's, which must be specifically stated in order that the

defendant may prepare his defense." [emphasis in original] *Id.*

We agree with the San Antonio Court of Appeals that our precedents require that a defendant be given adequate notice of the acts *he* is alleged to have committed.[1] *Gorman,* supra. We can find no precedent in this state supporting appellant's position. The basis for this court's prior decisions in granting a motion to quash are firmly based upon the notion that a defendant is entitled to know what acts *he* committed which constituted a criminal offense. Finally, an indictment which tracks the statutory language of the offense is generally sufficient in the face of a motion to quash. See *American Plant Food v. State,* 508 S.W.2d 598 (Tex. Cr.App.1974). No error is committed if the information requested in a motion to quash is essentially evidentiary in nature rather than being required for purposes of notice and bar. *Thomas,* supra. *Phillips v. State,* 597 S.W.2d 929, 931 (Tex.Cr.App. 1980). Ground of error seven is overruled.

In grounds of error three through six appellant challenges the dismissal for cause of four veniremen as being "Witherspoon excludable" jurors. See *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We have reviewed the voir dire of the four veniremen in question and find appellant's contention to be wholly without merit.

In two instances, the veniremen's testimony so clearly showed that they were unequivocally opposed to the death penalty and would, under all circumstances, vote against the imposition of the same under any and all circumstances, that defense counsel did not even attempt to rehabilitate the veniremen. In fact, there was no cross-examination whatsoever.

As to venireman Bowens there was no objection to his dismissal as a juror and his testimony clearly showed he could not be a fair and impartial juror. Finally, as to the last venireman, the appellant did object to the excusal. However, the testimony clearly showed that the venireman's views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* supra; *Adams,* supra. Grounds of error three through six are overruled.

Appellant next challenges the sufficiency of the evidence to prove that Trooper Boyd was acting in the lawful discharge of his official duty 'at the time he was killed. Appellant does not challenge the sufficiency of the evidence insofar as the evidence shows that appellant did in fact intentionally and knowingly kill Trooper Boyd on October 11, 1983.

This Court has previously held that, in reviewing the sufficiency of the evidence to support a conviction in either a direct or circumstantial evidence case, we must review the evidence in the light most favorable to the jury's verdict and consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Hudson v. State,* 675 S.W.2d 507 (Tex.Cr.App.1984); *Burks v. State,* 693 S.W.2d 932 (Tex.Cr. App.1985). Even though this Court now utilizes the same standard for judging the sufficiency of the evidence in both circumstantial and direct evidence cases, we have nonetheless held that the "outstanding reasonable hypothesis" analysis is still useful for applying the "any rational trier of fact could have found the essential elements of the offense" standard of review in circumstantial evidence cases. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (Opinion on State's Motion for Rehearing); *Wilson v. State,* 654 S.W.2d 465, 471 (Tex. Cr.App.1983) (Opinion on State's Motion for Rehearing).

With the foregoing principles in mind, we have no trouble in concluding that

---

1. All emphasis supplied by the writer of this opinion unless otherwise indicated.

the evidence in this case is sufficient for a rational trier of fact to have concluded beyond a reasonable doubt that Trooper Boyd was acting in the lawful discharge of his official duty at the time appellant killed him. When viewed in the light most favorable to the jury's verdict, the undisputed evidence showed that Trooper Boyd was in uniform and driving his DPS Patrol car at the time of the offense. The evidence further showed that the area in which Trooper Boyd was killed was a part of his normal patrol area. Janie Norris testified that when she viewed the appellant next to Trooper Boyd's vehicle, the emergency lights were flashing. Several witnesses at the scene confirmed Janie Norris's testimony in this regard. Trooper Boyd's ticket book was found on the ground close to his body.

Relying upon all the above facts, a rational trier of fact could have reasonably concluded that Trooper Boyd had stopped the appellant in order to issue a traffic citation. The record clearly reflects that the issuance of traffic citations is a primary official duty of Department of Public Safety troopers. There is no outstanding reasonable hypothesis other than that Trooper Boyd was engaged in the lawful discharge of his official duty at the time that the appellant shot and killed him. Ground of error one is overruled.

In ground of error eight, appellant complains of the admission of testimony regarding the extraneous offense of the murders of the Garzas that occurred one half an hour prior to the shooting of trooper Boyd. Appellant contends that this evidence does not fall within one of the "exceptions" to the general rule of inadmissibility of extraneous offenses. He cites *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App. 1972) and *McCann v. State*, 606 S.W.2d 897 (Tex.Cr.App.1980).

■ In *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983), this Court held that the so called "exceptions" noted in *Albrecht*, supra, were not intended to be an exclusive list of exceptions but rather a good list of examples as to whether the

standard for admissibility had been met. The test for admissibility is that extraneous offense evidence may become admissible upon a showing both that the offense is relevant to a material issue in the case and that the relevancy value of the evidence outweighs its inflammatory or prejudicial effect. *Williams*, supra; *Robinson v. State*, 701 S.W.2d 895 (Tex.Cr.App.1985).

We need not apply this test because it has long been the rule in this State that the jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum. *Archer v. State*, 607 S.W.2d 539 (Tex.Cr.App.1981). "It is well settled that where one offense or transaction is one continuous episode, or another offense or transaction is a part of the case on trial or blended or closely interwoven therewith, proof of all the facts is proper." *Mitchell v. State*, 650 S.W.2d 801, 811 (Tex.Cr.App. 1983).

■ Given the foregoing principles, it is readily apparent that the murders of Juan and Esther Garza were admissible to show "one continuous episode" and to show "that the case on trial" was "blended or closely interwoven" with the killing of Trooper Boyd, *Archer*, supra, and *Mitchell*, supra, to show the context in which the offense occurred. The testimony relating to the killings of the Garzas was extremely relevant to placing appellant in possession of the murder weapon one half hour before the death of Trooper Boyd. Ground of error eight is overruled.

In his final ground of error relating to the guilt/innocence phase of the trial, appellant complains of the trial court's failure to charge on the lesser included offense of murder. In determining whether a defendant is entitled to a charge on a lesser included offense, we will consider all the evidence presented at trial. *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984).

■ In *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App.1985) this Court, en banc, adopted the two prong test first enunciated in a panel opinion in *Royster v. State*, 622

S.W.2d 442 (Tex.Cr.App.1981). The first prong requires that the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense. *Aguilar*, supra, at 558.

Appellant's argument is premised upon the claim that the evidence in this cause was insufficient to show that Trooper Boyd was acting in the lawful discharge of his official duty. We can find no evidence in the record that Trooper Boyd was acting outside the scope of his official duty. Thus, appellant fails to meet the second prong of the *Royster-Aguilar* test in that there is no evidence in the record from which a rational trier of fact could have concluded that if appellant was guilty of any offense he was guilty only of the lesser offense of murder. Ground of error two is overruled.

In his last ground of error, appellant challenges the sufficiency of the evidence to support the jury's affirmative finding to special issue two. In determining the sufficiency of the evidence to support special issue two, we may take into account the facts adduced during the guilt/innocence phase of the trial. *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App. 1983); *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983), cert. den. 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221. The calculated nature of the defendant's act and the forethought with which he coldly planned and executed his crime is probative of his propensity to commit future acts of violence. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979). The circumstances of the offense itself, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue. *Andrade v. State*, 700 S.W.2d 585 (Tex.Cr.App.1985).

The facts of this offense alone clearly support the jury's finding that appellant would commit acts of violence that constitute a continuing threat to society. The evidence affirmatively proved that on the day of this offense appellant armed himself with enough weapons and ammunition to kill many people; in fact he killed six. He not only killed six people, he kidnapped and robbed six others.

The evidence at trial also showed that, six months earlier he attacked his wife's ex-husband for no apparent reason. We find the evidence clearly sufficient to support the jury's affirmative answer to special issue two.

The judgment is affirmed.

TEAGUE, Judge, concurring in result.

In a relatively short period of time, Eliseo Hernandez Moreno, hereinafter referred to as the appellant, mounted a savage course of criminal conduct from College Station through Hempstead, Houston and Pasadena, with his capture finally occurring in Wharton, during which time he killed six persons, kidnapped six persons, and, using a pistol, robbed another person. The record before us will not permit any reasonable inference that would have justified such conduct. In short, Eliseo Hernandez Moreno is a bad person and is in need of severe punishment for committing the criminal acts that he committed.

One beauty of our criminal justice system, however, is that regardless of how bad or mean a person might be, that person is nevertheless entitled to be given a fair and impartial trial for the offense he is put on trial for committing—in this instance the murder of Department of Public Safety Trooper Russell Lynn Boyd, which murder occurred outside of Hempstead, and after the appellant had fled from College Station where he had recently murdered his brother and sister-in-law, the Garzas.

In his eighth ground of error, the appellant asserts that the evidence that went to the first two persons that he killed, (the Garzas), during his short reign of terror should not have been admitted into evidence. The majority opinion rejects this contention, holding "that the murders of Juan and Esther Garza were admissible to show 'one continuous episode' and to show 'that the case on trial' was 'blended or

closely interwoven' with the killing of Trooper Boyd ... to show the context in which the offense occurred. The testimony relating to the killings of the Garzas was extremely relevant to placing appellant in possession of the murder weapon one half hour before the death of Trooper Boyd."

I am unable to agree with either this holding or the reasoning that Judge Campbell, the author of the majority opinion, uses to justify the holding.

The facts relating to this case closely resemble the facts in *Wallace v. State*, 679 S.W.2d 1 (Tex.Cr.App.1983), in which Judge Campbell, on original submission, wrote a unanimous opinion for this Court reversing the defendant's conviction after finding and holding in that attempted capital murder of a police officer case that it was reversible error to admit into evidence marihuana, cocaine, and methamphetamine that was discovered in the trunk of the automobile driven by the defendant. The defendant was tried for attempting to kill the police officer who arrested him. In a contextual sense, I believe that the evidence in that cause was as blended or closely interwoven as in this cause, and yet the evidence in that cause was ruled inadmissible but the evidence here is ruled admissible. Perhaps Mr. Webster and I simply do not understand the meaning of the word "context", which Webster defined as being "the interrelated conditions in which something exists or occurs." 283 *Webster's Ninth New Collegiate Dictionary* (1985 edition).

In this instance, there is absolutely no evidence to show a connection or relationship between the murders of the Garzas and the killing of Trooper Boyd. I pause to point out that the appellant was not on trial for committing the murders of the Garzas, but, instead, was on trial for murdering Trooper Boyd. Had the appellant been on trial for killing the Garzas, then all of the subsequent criminal acts that he committed would have been admissible under the doctrine of flight, and it matters little whether he fled 50 or 500 miles or however long it took to capture him. *Hunter v. State*, 496 S.W.2d 44, 46 (Tex.Cr.App.1973); *Solis v.*

*State*, 492 S.W.2d 561 (Tex.Cr.App.1973); *Arivette v. State*, 513 S.W.2d 857, 862 (Tex. Cr.App.1974). Also see the many, many cases collated under *West* criminal law keys numbered 369.1, 369.2(1), 369.2(8), 372(1), and 351(3). Had the appellant been on trial for killing the Garzas, flight to escape the immediate consequences of those murders would have been but the unfolding, from alpha to omega, of what thereafter occurred. But, that is not this case. The appellant was not on trial for killing the Garzas; he was on trial for killing Trooper Boyd. Thus, the doctrine of flight does not become implicated in this cause until after he killed Trooper Boyd. In all due respect to Judge Campbell and those who join his opinion, there is simply no legal justification for admitting into evidence at the guilt stage of the appellant's trial the murders of the Garzas.

Although I believe that the trial judge erred when he admitted the testimony going to the murders of the Garzas into evidence, in light of the fact that four other killings and one aggravated robbery were properly admitted into evidence, I am unable to state that there is a reasonable possibility that such contributed either to the finding of guilt or the affirmative findings. *Maynard v. State*, 685 S.W.2d 60 (Tex.Cr.App.1985). Thus, the error was harmless to the appellant. Furthermore, under Art. 37.071, V.A.C.C.P., this evidence would have been admissible at the punishment stage of the trial.

I agree with the majority opinion's holding that the trial judge did not err in overruling the appellant's motion to quash. However, I would base this decision on this Court's two recent decisions of *Adams v. State*, 707 S.W.2d 900 (Tex.Cr.App.1986), and *Opdahl v. State*, 705 S.W.2d 697 (Tex. Cr.App.1986), which cases should make it absolutely clear to anyone that at the present time a defendant who challenges a trial judge's decision to overrule a motion to quash an indictment or information is attempting to achieve the impossible.

I also take issue with the majority opinion's holding that the facts adduced at the

guilt stage of the trial are sufficient to support the jury's affirmative finding to the probability question. See Art. 37.071, V.A.C.C.P. In particular, I am compelled to continue to protest to this Court's giving its court-created legal conclusion, that the facts of the offense itself are sufficient to sustain an affirmative finding to the probability question, continuing viability.

"The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." Stewart, J., concurring opinion, *Furman v. Georgia*, 92 S.Ct., at 2760. These are many of the reasons why our Legislature enacted our capital murder law as it did.

The issue that is before us today, however, is not whether death is cruel and unusual punishment, because at the present time both this Court and the Supreme Court, as presently constituted, have determined that it is not. The issue that is before us, however, concerns what meaning we must give to the provisions of Art. 37.071, V.A.C.C.P.

I find that by holding that an affirmative finding can be supported only by the facts of the case, as the majority does in this cause, is an attempt to act Legislatively. Furthermore, if that is a good rule of law, then, pray tell, why did the Supreme Court of the United States in *Branch v. Texas*, sub nom, *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), hold that the then Texas statute on capital murder violated the Eighth and Fourteenth Amendments to the Federal Constitution because a Texas jury was given untrammeled discretion to let an accused live or insist that he die? Why did our Legislature go to the time, expense, and trouble to thereafter put into our capital murder statute restrictions on the jury's decision to cause the death penalty to be imposed? To continue to adhere to the above rule of law

that this Court itself created in *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), is, I believe, a plea to the Legislature to abolish the provisions of Art. 37.071, V.A.C.C.P. And, who knows, the present aggressive and assertive majority of the Supreme Court of the United States just might expressly overrule *Furman v. Georgia*, supra.

Notwithstanding what I have stated, but in light of the fact that the infliction of death on a convicted criminal is not now cruel and unusual punishment, I am constrained to find, after excluding the inadmissible evidence, that there is sufficient evidence to sustain the jury's affirmative finding that there is a probability that the appellant will in the future commit criminal acts of violence that would constitute a continuing threat to society.

The appellant blames what happened on the fact that he was then "suffering the combined effects of chronic alcoholism and severe emotional distress over an involuntary separation from his spouse." He also presented evidence that he would not be a continuing threat to society if he was denied access to alcoholic beverages. However, it is a well known fact that inmates in the Department of Corrections have access to, among other things, alcohol, albeit it may be the home grown variety.

I, for one, am unable to believe that an involuntary separation from one's spouse is sufficient reason or cause that would warrant that person killing six persons at three separate locations in a cold, calculating and brutal manner, with that person each time firing multiple shots at his victims at obviously close range. The evidence additionally established that the appellant threatened the lives of numerous other persons. Throw in the murders of the Garzas and this gave the State a powerful argument why the jury should reach the decision that would cause the trial judge to impose the death penalty. Had appellant managed to evade the roadblock set up in Wharton, in light of the human destruction that he had earlier and quickly committed, I believe that there is at least a reasonable probabili-

ty that he would have caused much more human destruction and misery.

Eliseo Hernandez Moreno has demonstrated to me that he can be a mean and vicious member of the human race. Based upon the record that is before us, and the present state of the law, it is my judgment that Moreno must die by lethal injection.

The majority opinion reaches the right result, albeit in overruling several of the appellant's grounds of error it does so for the wrong reasons.