**Opinion issued May 21, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00615-CR

———————————

**KEVIN WASHINGTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1235382**

---

## MEMORANDUM OPINION

A jury convicted Kevin Washington of aggravated robbery.[1] The trial court

assessed punishment at seventy-five years' confinement. In two issues,

Washington contends that the trial court erred in (1) denying his motion to

---

[1]    *See* TEX. PENAL CODE ANN. § 29.03 (West 2011).

suppress identification and (2) allowing trial testimony about a contemporaneous sexual assault. We affirm the trial court's judgment.

## Background

At approximately 5:30 a.m. on September 18, 2009, three men with guns approached Mr. Stubblefield in the garage of his apartment. Two of the men, later identified as Darius Cooper and Marcus Smith, wore bandanas over their faces and black clothing. The third man, later identified by Mr. Stubblefield as Washington, wore a white towel over his face, a light blue or turquoise shirt, and blue jean shorts or pants. Washington asked Mr. Stubblefield who else was in the apartment and told him that, if he did everything he was told, he would not be killed. The three men forced Mr. Stubblefield into the apartment where his wife was asleep in the bedroom.

Mr. Stubblefield was told to lie on the bed in the bedroom. He got up from the bed twice—once when asked for his debit card and PIN number and again when Washington asked for help in disconnecting a satellite receiver. At one of these times, Mr. Stubblefield saw Washington's face when the white towel dropped for two to three seconds. Mr. Stubblefield's wife was on the bed the entire time the men were in the apartment. She heard one of them speak with a Louisiana accent, and saw the intruder with the blue shirt and white towel on his face (the

2

intruder her husband identified as Washington),[2] and another intruder in all black with something over his face, but did not see the faces of any of the intruders. At least one man stayed in the bedroom while the others gathered the Stubblefields' belongings throughout the apartment and garage.

Immediately before they left the apartment, all three men were in the bedroom with the Stubblefields. One tied Mr. Stubblefield's hands and tied his feet to the bed with electrical cords. The intruder with the white towel on his face (Washington) tied his wife's hands and feet with electrical cords, touched her hand, and asked her how long she had been married. He then pulled down her pajama bottoms, rubbed her buttocks, spread her legs apart, and inserted his fingers or hands inside her vagina. Mr. Stubblefield felt the bed shaking and suspected that his wife was being assaulted. When he lifted his head to look, another of the intruders put a gun to Mr. Stubblefield's head and told him to lie down.

The intruders were at the Stubblefields' home for approximately thirty minutes. When they left, they took Mr. Stubblefield's truck and personal property valued at approximately $15,000 to $18,000. The property included electronic equipment, handguns, purses, jewelry, musical instruments, and debit cards with the card PIN numbers.

---

[2] Evidence at trial showed that DNA from the white towel could not be matched to Washington, but could be matched to Cooper.

3

Shortly after the intruders left, Mr. Stubblefield untied himself and his wife. They ran to a neighbor's home and called the police. That same day, the Stubblefields provided their statements to the police, which included descriptions of Cooper, Smith and Washington. The Stubblefields described the men as three black males between the ages of seventeen and twenty-five, "[o]ne tall, one short, spoke with a Louisiana accent"; and "[o]ne they thought was a little bit older guy that was in charge." The older one, later identified as Washington, was described as 5'9" or 5'10", 190 to 200 pounds, twenty to twenty-five years old, and with short hair. Mr. Stubblefield stated that the older man wore a turquoise shirt, had a white towel over his face, and had a gold tooth.

At Harris County Sheriff Detective Simmons's request, Mr. Stubblefield checked his bank account for any activity. Shortly after the robbery, approximately $500 had been taken from his account, using the stolen debit cards in three ATM transactions at two different gas stations. Simmons obtained surveillance video tapes from the gas stations and, from one of the tapes, took two still photos—one of a man entering the gas station where the ATM was used and one of the same man with a black vehicle at that station.

The next day, Detective Simmons showed the two photos to the Stubblefields. He asked each if the man in the photos was one of the robbers at their apartment. Mr. Stubblefield positively identified the man as the person who

4

first approached him in the garage the previous day. He identified the man based on the blue shirt and facial features, and his resemblance to a childhood acquaintance.

Mr. Stubblefield's wife did not recognize the man's face, but she identified him as one of the intruders because she recognized the light blue shirt. She testified that her father, a retired police chief, told her that if she were in a bad situation to pick something out to stick with her, and that she picked out the light blue shirt. She remembered the shirt because it had writing and she thought it odd that someone would wear a light-colored shirt to rob someone. At the time, Simmons did not know the identity of the man in the photos.

The police soon located items belonging to the Stubblefields at a pawn shop near their home. By talking with the pawn shop manager, police identified Cooper and Smith as the persons who pawned the items on the day of the robbery. The manager, however, did not know the name of a third black male who was with them that day. When arrested, Cooper and Smith each admitted involvement in the robbery. Smith named Washington as the third man at the Stubblefields' apartment; Cooper confirmed that identification.[3]

---

[3]    Smith, Washington's cousin, testified at trial. Smith testified that he committed the robbery with Cooper and another individual named Deundre. According to Smith, he borrowed Washington's vehicle before committing the robbery and, when he returned it, gave Washington some of the stolen goods, including the debit card.

Once he had Washington's name, Detective Simmons created a computer-generated photo array that included Washington's photo and the photos of five other African-American males. Simmons showed the photo array to the pawn shop manager who positively identified Washington as the individual at the shop on two occasions connected with the goods taken from the Stubblefields: first, with Cooper and Smith when they pawned the Stubblefields' electronic equipment and, second, several days later when he sold Ms. Stubblefield's purses to the pawn shop.

Several days after the robbery and after showing the Stubblefields the photographs from the gas station, Detective Simmons showed the photo array to the Stubblefields. Simmons gave each of the Stubblefields written instructions, which stated that they should not conclude or guess that the photographs contained a picture of the person who committed the crime and that they were not obligated to identify anyone. Mr. Stubblefield immediately and positively identified Washington. Simmons testified that Mr. Stubblefield became upset when shown the photo array and remembered Washington as the man who stayed in their bedroom for most of the robbery. His wife could not identify anyone in the photo array.

Washington filed a motion to suppress his identification, contending that it was obtained by impermissibly suggestive procedures that gave rise to an

6

irreparable identification. According to Washington, (1) the Stubblefields' descriptions did not match his appearance, except for his race; and (2) they were shown his photograph from the gas station and told he was involved in the incident. At the suppression hearing, Washington also contended that the photo array was suggestive because only two other individuals in the array had skin tones similar to his and those two individuals were younger than he.

Washington and Mr. Stubblefield testified at the pretrial suppression hearing, which occurred in two parts. After Washington's testimony, the trial court found the photo array was "impermissibly suggestive," but withheld a ruling pending further testimony about the totality of the circumstances. The case proceeded to trial. Early in the trial, the court granted Washington's motion for a mistrial after one of the State's witnesses mentioned the alleged sexual assault in violation of the court's ruling on Washington's motion in limine.

After the mistrial, the court resumed the hearing on Washington's motion to suppress. Mr. Stubblefield testified about the events on September 18 and his identification of Washington in the photo array. Mr. Stubblefield also positively identified Washington based on his memory from the day of the robbery. After additional evidence, the court denied the motion to suppress based on the totality of the circumstances surrounding the identification. [4]

---

[4] A different judge presided over the second trial.

During the second trial, Mr. Stubblefield again positively identified Washington in court as the person who committed the robbery over Washington's objection. The court also admitted the photo array into evidence over Washington's objections. Although objecting to the in-court identification and the photo array based on an allegedly improper procedure, Washington did not object to admission of the surveillance videos from the two gas stations, the two photographs taken from the videos, or testimony about the identification of the individual in the photos.

A jury found Washington guilty of aggravated robbery. Following a punishment hearing, the trial court sentenced Washington to seventy-five years' confinement. This appeal followed.

**Pretrial Identification**

Washington argues that the identification should have been suppressed based on "the initial one photo identification and the overly-suggestive photo spread." "[T]he police showed the two complainants one photograph of Mr. Washington and told the two eye witnesses that he was the man that had used their debit cards at a gas station" and later showed a photo array with "only two [photos] matching the general description given by the complainants." He argues that "the totality of the circumstances and inappropriate use" of a single photo required suppression of the identification.

8

## A. Standard of review

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *See Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). When challenging the admissibility of a pretrial identification, a defendant has the burden to show that (1) the out-of-court identification procedure was impermissibly suggestive, and (2) the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33.

In reviewing a trial court's decision on the admissibility of a pretrial identification, we defer to the trial court's rulings on mixed questions of law and fact if they turn on the credibility and demeanor of witnesses. The question of whether a pretrial identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor; therefore, we apply a de novo standard of review. *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998). If a pretrial identification procedure was impermissibly suggestive, the court must consider whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 381–82 (1972). The factors considered in this analysis are issues of historical fact and are considered

9

deferentially in a light most favorable to the trial court. *Loserth*, 963 S.W.2d at 773–74. Viewed in this way, the factors are weighed de novo against "the corrupting effect" of the suggestive pretrial procedure. *Ibarra v. State*, 11 S.W.3d 189, 195–96 (Tex. Crim. App. 1999).

Appellate courts are not limited to reviewing only the evidence adduced at the admissibility hearing when considering the identification. *Webb v. State*, 760 S.W.2d 263, 272 n.13 (Tex. Crim. App. 1988). An appellate court may review both the hearing testimony and evidence adduced at trial when determining the admissibility of a pretrial identification. *Id.*

**B.  Impermissibly suggestive**

Suggestiveness may arise from the manner in which a pretrial identification procedure was conducted. *Barley*, 906 S.W.2d at 33. For example, a police officer might point out the suspect or suggest that the suspect's photograph was included in the specific array. *Id.* In addition, the content of the photo array itself may be suggestive if the suspect is the only individual who resembles the witness's description. *Id.* An identification may be suggestive based upon a single procedure or the cumulative effect of multiple procedures. *Id.*

In determining the suggestiveness of an out-of-court identification, a court examines the manner in which the pretrial procedure was conducted, as well as the content of the line-up or photo array. *See Burns v. State*, 923 S.W.2d 233, 237–38

(Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (considering content of video line-up and manner in which it was conducted). Even if a pretrial identification procedure may have been suggestive, the defendant must establish by clear and convincing evidence that the procedure was *impermissibly* suggestive. *Barley*, 906 S.W.2d at 33–34. To be impermissibly suggestive, the identification procedure must in some way be so defective as to indicate or suggest the individual in the photograph that the witness is to identify. *Ward v. State*, 474 S.W.2d 471, 475 (Tex. Crim. App. 1971).

### 1. The photo array

Washington argues that the photo array was compiled to lead to him because it was one-sided—only two of the other five African-American individuals in the array had light skin tones and those two individuals were younger than Washington.[5] The photo array, however, does not indicate or suggest the photograph the Stubblefields were to identify.

The six individuals in the photo array fit the general description the Stubblefields provided about the individual in their home. Detective Simmons testified that the Stubblefields described the three perpetrators as black males, between seventeen and twenty-five years old, "[o]ne tall, one short, spoke with like

---

[5]    Washington testified that he was thirty-one at the time of the robbery. It appears from the photo array that the other two individuals with lighter complexions were between 20 and 25 years old.

a Louisiana accent they thought." They described the two younger, thinner males as 6'0" to 6'2" tall and 150 pounds, and 5'6 to 5'8" tall and 140 to 160 pounds, and "17 to 20." The description of the older male was 5'9" to 5'10" tall, 190 to 200 pounds, and "[s]tocky. Short hair . . . 20 to 25" and with a gold tooth. Simmons did not recall that the Stubblefields described Washington as having a light complexion.

Although every photographic array must contain photographs of individuals who fit the rough description of the suspect, it is not essential that all individuals be identical in appearance. *Buxton v. State*, 699 S.W. 2d 212, 216 (Tex. Crim. App. 1985). Neither due process nor common sense requires that the features of individuals in a lineup exhibit match those of the accused. *Colgin v. State*, 132 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (citing *Turner v. State*, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980)). Additionally, a photo array is not impermissibly suggestive even if it includes photographs of individuals of varying skin tones or varying ages. *See Buxton*, 699 S.W.2d at 216 (concluding that pretrial line-up of black males with varying skin tones was not unduly suggestive although subjects differed by range of five inches in height and thirty-five pounds in weight); *Williams v. State*, 675 S.W.2d 754, 757 (Tex. Crim. App. 1984) (holding that line up was not impermissibly suggestive when appellant was only one of two men who appeared to match age in witness's description and

others looked younger); *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that photographic array was not impermissibly suggestive because all men were African-American, wore civilian clothes, had short black hair and appeared to be similar in age).

We have reviewed the color photo array, which was admitted at trial. The men in the photo array fit the Stubblefields' descriptions. All six men were African-Americans with similar haircuts and similar facial features. The men appear to be within a similar age range and have similar skin tones. All wore white shirts. All six individuals in the photo array are close-lipped with no teeth showing. We conclude that the photo array was not impermissibly suggestive.

### 2. The two still photos

Washington also contends that the procedure of the photo array combined with the two still photos taken from the videotapes and shown to the Stubblefields resulted in a significant chance of misidentification. Use of a single photograph as a photo array can be impermissibly suggestive. *See, e.g., Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) (holding that showing complainant's wife single photograph after she asked to see picture of man arrested for her husband's murder was impermissibly suggestive); *Bond v. State*, 29 S.W.3d 169, 172 (Tex. App.— Houston [14th Dist.] 2000, pet. ref'd) (concluding that pretrial identification was impermissibly suggestive when police officer showed complainant single

photograph faxed from police department while officer was at complainant's home investigating crime less than one hour after incident). Use of a single photograph, without any of the traditional safeguards of a lineup or a photographic array, may suggest to a witness that the person in the photograph was the person whom the witness saw. *See Simmons*, 390 U.S. at 383–84, 88 S. Ct. at 971 (noting that "the witness thereafter is apt to retain in his memory the image of the photograph rather than that of the person actually seen.").

In this case, the Stubblefields first viewed the two photos from the gas station the day after the robbery. Detective Simmons told the Stubblefields that the individual in the photos had used their debit card at a gas station ATM. Simmons then asked if the photographed individual robbed them, was one of the robbers, or was at their house. After showing the Stubblefields the two still photos, he prepared the photo array that he showed to the Stubblefields.

Despite having seen the two still photos from the gas station, Mrs. Stubblefield could not identify anyone in the photo array prepared by Detective Simmons. Mr. Stubblefield testified that he identified Washington based on what he saw on the day of the robbery, not based on the gas station photos. Simmons testified that the gas station photos of Washington were not "that good," were taken from a distance, and were not "a positive identification" of him. One of the

photos shows Washington at a distance. In the other photo, Washington's head is pointed down and turned at an angle.

Although the pretrial identification procedure may have been suggestive, Washington did not meet his burden to present clear and convincing evidence that the pretrial identification was impermissibly suggestive.[6]

## C.     Substantial likelihood of misidentification

Even assuming without deciding that the pretrial identification procedure was impermissibly suggestive, it did not create a substantial likelihood of irreparable misidentification. *See Barley*, 906 S.W.2d at 34. "The test is whether considering the totality of the circumstances, 'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ibarra*, 11 S.W.3d at 195 (quoting *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971).

---

[6]     Washington also argues that the pretrial identification procedures in this case are improper under article 38.20 of the Texas Code of Criminal Procedure, entitled "Photograph and Live Lineup Identification Procedures." TEX. CODE CRIM. PROC. ANN. art. 38.20 (West Supp. 2012). Article 38.20 requires law enforcement agencies to adopt and implement written policies for administration of photograph identification procedures. *Id.* at § 3(b). Any policy adopted must address procedures for assigning an administrator capable of "administering a photograph array in a blind manner or in a manner consistent with other proven or best supported practices designed to prevent opportunities to influence the witness." *Id.* at § 3(c)(2)(F). The statute applies only to a photograph identification procedure conducted on or after September 1, 2012. Act of May 18, 2011, 82nd Leg., R.S., ch. 219, § 2(c), 2011 TEX. GEN. LAWS 792, 794.

In assessing reliability, five non-exclusive factors should be weighed against the corrupting effect of a suggestive identification procedure: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). If the totality of the circumstances reveals no substantial likelihood of misidentification then, despite a suggestive pretrial procedure, the pretrial identification and subsequent in-court identification will be deemed reliable. *Webb*, 760 S.W.2d at 269. "Reliability is the linchpin in determining the admissibility of identification testimony." *Luna*, 268 S.W.3d at 605.

The Stubblefields had adequate opportunity to view Washington at the time of the robbery. Mr. Stubblefield first saw Washington, although with the white towel over his face, in the lighted garage for twenty to twenty-five seconds. The garage lighting was adequate for Mr. Stubblefield to see the types and colors of the guns and Washington's clothing. Mr. Stubblefield also testified that he saw Washington's face for long enough to get a good look at it. When Mr. Stubblefield was unhooking the satellite receiver or getting his debit card and PIN, he saw Washington's face for two to three seconds when the towel dropped and

16

Washington bent down, picked it up, and put it back on his face. Although the bedroom light was off, the lights in the house and in the hallway directly in front of the bedroom were on. Washington stood in the doorway between the hallway and the bedroom. The hallway light shined into the bedroom so that Mr. Stubblefield could see Washington's face.

Mr. Stubblefield's testimony shows that he was attentive when he saw Washington. Mr. Stubblefield is African-American and is a United States Air Force veteran who served for nearly five years. When the three men approached him in the garage, Mr. Stubblefield assessed their height and weight. When the towel dropped from Washington's face, Mr. Stubblefield intentionally looked at Washington because he wanted to be able to identify him and remember his face. Mr. Stubblefield noticed that Washington resembled or favored someone whom he knew growing up.

Mr. Stubblefield's wife also was attentive. She testified that her father, a retired police chief, advised her to pick out one thing that she could remember later if she were ever in a bad situation. As to Washington, she picked out the "light blue turquoise shirt" that had "a little writing on it"; "the blue stuck out." She also testified that Washington was the one who touched her and asked her how long she had been married.

The Stubblefields' descriptions of Washington were sufficiently accurate. *See Bond*, 29 S.W.3d at 173 (stating that descriptions do not have to be identical in all respects to be accurate). Their descriptions of Washington's height and weight were within the range of Washington's actual height and weight. The Stubblefields described him as a black male, who had short hair and was approximately twenty to twenty-five years old, 5'9" or 5'10 in height, and 190 to 200 pounds in weight. The arresting officer estimated Washington's height and weight at 5'11" and 200 pounds. At trial, the pawn shop manager described Washington as a black male, about 5'10" and 225 pounds, and twenty-eight or twenty-nine years old. At the pretrial hearing, Washington testified that he is 6 foot, weighed 242 pounds, and was thirty-one at the time of the robbery. Although Mr. Stubblefield may have inaccurately described Washington as having a gold tooth because he did not have one at trial, Mr. Stubblefield's general description was sufficiently accurate.

The Stubblefields demonstrated a high degree of certainty about the details of the event. Mr. Stubblefield testified consistently about the details of the event in his statement to the police, his pretrial testimony, and his trial testimony. He positively identified Washington in the still photos from the gas station the day after the robbery, the photo array several days after the robbery, and in court at the pretrial hearing and trial. He twice testified that he based his photo array and in-court identifications on what he saw the morning of the robbery, not on the gas

18

station photos. He immediately knew the man in the photographs was Washington because "it was the person that I saw" and remembered him from the day of the robbery. Mr. Stubblefield testified that he was certain that the person he identified was the same person who committed the robbery and "held a gun to me and told me they were going to kill me." Detective Simmons testified that, when shown the photo array, Mr. Stubblefield became upset and remembered Washington as the man who stayed in the bedroom with his wife and him during most of the time that they were tied up. Ms. Stubblefield immediately identified the man in the still photos based on his shirt.

The time between the offense and the identification does not create an issue on the accuracy of the identification. The Stubblefields identified the man in the still gas station photos the day after the robbery. Mr. Stubblefield identified Washington in the photo array only days after seeing the still photos. He identified Washington twice in court less than two years later.

Weighing these factors against the suggestiveness of the pretrial identification procedures, we conclude that the identification procedure did not give rise to a substantial likelihood of irreparable misidentification. We overrule Washington's first issue.

**Admission of Extraneous Offense Evidence**

In his second issue, Washington contends that evidence of the alleged sexual assault should have been excluded because the evidence was not necessary to establish the charged offense and was prejudicial. Washington contends that the sexual assault was not inextricably intertwined with the charged offense, the aggravated robbery. He states that the evidence was used "to show generally that [he] had a bad character."

## A. Standard of review

We review the trial court's evidentiary ruling for an abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd as untimely filed). Unless the court's decision was outside "the zone of reasonable disagreement," we will uphold the ruling. *Oprean*, 201 S.W.3d at 726; *Walker*, 321 S.W.3d at 22.

## B. Admissibility of sexual assault evidence

Before trial, the State gave notice of its intent to use evidence of the sexual assault. *See* TEX. R. EVID. 404(b) (conditioning admissibility of extraneous offense evidence on reasonable notice before trial). Under Rule 404, evidence of other crimes or acts is not admissible to show that a defendant committed the charged offense in conformity with a bad character. *See id.*; *Devoe v. State*, 354 S.W.3d

457, 469 (Tex. Crim. App. 2011). Extraneous offense evidence, however, may be admissible when it has relevance apart from character conformity. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). It may be admissible to show proof of motive, opportunity, intent, preparation, identity, or absence of mistake or accident. *Id.*

Evidence of another crime also may be admissible as same-transaction contextual evidence when "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others." *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000). Same-transaction contextual evidence is admitted because events do not occur in a vacuum and a jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Devoe*, 354 S.W.3d at 469; *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). Same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence and only to the extent it is necessary to the jury's understanding of the offense. *McDonald v. State*, 179 S.W.3d 571, 577 (Tex. Crim. App. 2005) (quoting *Wyatt,* 23 S.W.3d at 25). "That is, it is admissible when several offenses are 'so intermixed or connected as to form a single, indivisible criminal transaction, such that in narrating the one, it is impracticable to avoid

describing the other.'" *Id.* (quoting *Rogers v. State*, 843 S.W.2d 29, 33–34 (Tex. Crim. App. 1993)).

In this case, the trial court concluded that the jury was entitled to know all of the facts and circumstances surrounding the commission of the offense because "[i]t all seems to be one continuing episode," and the sexual assault allegation "seems closely interwoven with the offense." Washington contends that the trial court's decision was erroneous, relying on *Pondexter v. State*, 942 S.W.2d 577 (Tex. Crim. App. 1996).

In *Pondexter*, the Court concluded that evidence of the defendant's purported gang affiliations and activities, including conversations about gang activity, was inadmissible as same transaction evidence in defendant's murder trial. *Id.* at 584. The gang-related evidence was not necessary to place the events of the murder in context but "was introduced simply as an attempt to connect [the defendant] to gangs in order to show his bad character." *Id.*

That is not the case here; the evidence provided understanding and context of the circumstances of the robbery and Mr. Stubblefield's identification. The alleged sexual assault occurred during the approximately thirty minutes that Washington was in the Stubblefields' home and committed aggravated robbery. The evidence describes Washington's conduct and activities while in the Stubblefields' bedroom. The evidence also explained Mr. Stubblefield's and his

22

wife's focus on Washington as one of the three intruders and provides context for their description of Washington. We conclude that the assault is part of the surrounding facts and circumstances of the charged offense of aggravated robbery. *See Moreno*, 721 S.W.2d at 301. The evidence allowed the jury to consider the charged offense in the context in which it actually occurred.

We reject Washington's contention that the sexual assault evidence was admitted to show bad character. The court gave the jury a limiting instruction on evidence of extraneous offenses:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

This instruction cured any error in admission of the sexual assault evidence. *See Gamez v. State*, 737 S.W.2d 315, 324 (Tex. Crim. App. 1987) (stating that presumption exists that juries will follow court's instructions).

We conclude that the trial court did not abuse its discretion. It was within the zone of reasonable disagreement to find the sexual assault to be contextual evidence. We overrule Washington's second issue.

23

## Conclusion

Having overruled each of Washington's issues on appeal, we affirm the judgment of the trial court.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).