# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00268-CR

**Brian Gattis, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NO. 2032572, HONORABLE SAM ROBERTSON, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Brian Gattis appeals from his conviction for aggravated assault. *See* Tex. Pen. Code Ann. § 22.02 (West Supp. 2005).[1] After the jury found appellant guilty, it assessed punishment at seven years' imprisonment. Appellant brings one issue on appeal, contending that the trial court committed reversible error by admitting evidence of an extraneous offense.

### Background

Around 9:00 p.m. on July 3, 2003, Gary Abbott and his wife Stephanie were traveling from Austin to Lake Buchanan. From Slaughter Lane, they entered an I-35 entrance ramp heading north. Stephanie, the driver, noticed a 1980s blue Volvo station wagon following closely. As they entered the freeway, the Volvo passed between the Abbotts' car and another car in the next lane,

---

[1] Appellant was indicted for intentionally and knowingly threatening Gary Abbott with imminent bodily injury and using a deadly weapon, a vehicle.

traveling along the center line between the lanes. Stephanie flashed her car's lights at the Volvo driver and the other driver honked the horn. The Volvo moved into the right lane, started going faster, and almost veered off the road twice. Gary thought the Volvo's driver was probably drunk. Stephanie drove close enough to the Volvo for Gary to see the license plate number so that she could call 911.

As he was doing so, the Volvo driver slammed on its brakes and veered back toward the Abbotts. The driver leaned out the window and "shot the finger" at the Abbotts, then pulled into the center lane behind them, approaching so close to their car's rear bumper that they could no longer see the Volvo's headlights in their rearview mirror. Although Stephanie attempted to exit the freeway at the William Cannon exit, the volume of traffic prevented her from so doing. Meanwhile, the Volvo driver pulled to their left and began swerving his vehicle at them. Mr. Abbott said that the Volvo's driver appeared angry and was screaming something at them while he "shot the finger" again. On the third swerve, the Volvo hit the Abbotts' car, causing their outside mirror to break the Volvo's rear passenger-side window. The Abbotts' red Chevy Cavalier sustained damage to its side.

Shaken, the Abbotts pulled over to the shoulder of I-35. The Volvo pulled over about 100 yards in front of them. Gary again tried to call 911. After the operator answered, he began explaining what happened. While he was on the telephone, the Volvo left the scene and re-entered I-35. The Abbotts pulled into a parking lot to wait for the police.

Roseanne Castillo had just entered I-35 at William Cannon and was heading north in her maroon F-150 pickup truck when she witnessed a blue station wagon running a red car off the road. She honked at the blue car and began searching for her cell phone to call 911. The red and blue cars both pulled over to the side of the road while she continued north. About a mile up the

2

road, Castillo saw the same blue car behind her, approaching rapidly. It bumped the back of her truck twice, then cut off the vehicle next to her so it could pull up beside her truck. The driver was shaking his head and leaning out the window yelling at her. Coincidentally, Roseanne's brother Abdias Castillo was driving home from Schlitterbahn that evening and saw appellant's Volvo bumping the back of his sister's truck. He began honking at the Volvo and motioning at the driver. Abdias exited the freeway at the Ben White exit. Although the Volvo had nearly passed the exit, it made a sharp turn, cut over to the exit ramp, and followed Abdias off the highway. Meanwhile, Roseanne had called 911 to report these events.

After exiting, Abdias pulled into a hotel parking lot with the Volvo following him. Abdias left his car and waved at appellant. Appellant then "gunned his car" and drove straight toward Abdias, who was standing at the back of his green Dodge Neon. Appellant's car did not hit him but hit the Neon, causing damage to the bumper, taillight, and door. Abidas's wife was still inside the car and was upset but physically unharmed. Abdias called 911. Appellant left the scene.

On that same evening, Kerry Spear left work, heading north on Meinardus just before its intersection with St. Elmo. He saw a dark-colored car sideswipe a motorcycle, knocking the rider off the motorcycle.[2] The motorcyclist started running away and yelled to Spear to "call the law."[3]

---

[2] The time sequence was not entirely clear. Testimony described the area of the motorcycle crash as being close to the strip of hotels running from the 4600 to the 4000 blocks of I-35 and the Meinardus-St. Elmo intersection as being about a block from the frontage road in this area and just south of Ben White. It appears most logical that appellant left the freeway, followed Abdias into a hotel parking lot, then left that lot and encountered the cyclist before fleeing that scene and being apprehended at Ben White and Riverside. It appears that the police investigated all of the incidents at more or less the same time.

[3] The motorcycle was later determined to be stolen.

3

Spear called 911. Sylvia Casiano described seeing a dark-colored car, which she described as an older model Volkswagon, driving rapidly and making an unusually wide turn out of a parking lot when it "swiped" the motorcycle.

Officer Scott Lando was dispatched to the scene of the motorcycle accident. He interviewed the witnesses at the scene. The motorcycle was lying in the middle of the intersection of St. Elmo and Meinardus and was badly damaged. The blue car had left the scene. Based on the information from the witnesses at the scene and the information provided by officers investigating the other emergency calls made that evening, Officer Lando believed the blue car that hit the motorcycle was the same vehicle involved in the other collisions.

Officer Dallas Goodman also responded to the motorcycle scene, then, shortly after arriving there, received a call to go to the location of the Neon, which was "right up the road" in a motel complex. He observed the damage to the Neon and Roseanne's truck. He went back to the motorcycle's location where he received a call that officers had located the blue Volvo and arrested the driver. Goodman went to that location and observed a vehicle that matched the description given by the witnesses at the scene of the motorcycle accident.

Officer Michael Bacon initially discovered and apprehended appellant near East Riverside and Ben White. When Bacon first saw appellant, he was slumped over the steering wheel of the blue Volvo, which had sustained collision damage. The appellant then got out of the car. Bacon thought that appellant was highly intoxicated. Appellant was banging his head and kicking the door of the squad car after his arrest; restraints had to be placed on his legs, and the officers used a short blast of pepper spray at one point to subdue him.

4

Gary was asked to come to the location of appellant's arrest. He identified appellant's blue Volvo as the car that sideswiped his car and appellant as the driver of that car.

Appellant testified in his own defense. He said that he had been celebrating his new job by drinking with his new boss. He had four or five vodkas, then left to drive himself home. He admitted he was drunk and was not wearing his prescription glasses as called for in his license restriction. He said he was having trouble with a bald tire, causing his car to veer to the right, and said that the car was stalling occasionally. He remembered hitting the Abbotts' red car but claimed it was unintentional. He did not remember being belligerent, denying that he wore glasses, or telling the police that he had not been involved in a collision. Appellant conceded that he had a criminal history including assault, bodily injury, resisting arrest, family violence, violation of a protective order, and DWI.

## Discussion

In his only issue, appellant contends that the trial court erred in admitting the evidence concerning the collision with the motorcycle in violation of Texas Rules of Evidence 402, 403, and 404(b) as an extraneous offense. The State responds that the motorcycle collision was admissible to show a continuing course of conduct that rebutted appellant's defensive theory of accident.

### *Extraneous Offenses*

A defendant may not be tried for collateral crimes or for being a criminal generally. Tex. R. Evid. 404(b);[4] *Nobles v. State*, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992); *Jones v. State*,

---

[4] Hereafter, in both text and footnotes, the Texas Rules of Evidence will be cited as Rule __.

119 S.W.3d 412, 418 (Tex. App.—Fort Worth 2003, no pet.). Therefore, extraneous offenses are not admissible at the guilt-innocence phase of trial to prove that a defendant acted in conformity with his character by committing the charged offense. Rule 404(b); *Jones*, 119 S.W.3d at 418-19.

However, an extraneous offense that tends to make an elemental or evidentiary fact more or less probable or tends to rebut a defensive theory has relevance beyond the tendency to prove a person's character. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990); *Johnson v. State*, 932 S.W.2d 296, 301 (Tex. App.—Austin 1996, pet. ref'd). Evidence of other crimes or misconduct may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or accident, or to rebut a defensive theory. Rule 404(b); *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). The list of exceptions in Rule 404(b) is neither mutually exclusive nor exhaustive. *See Johnston*, 145 S.W.3d at 219; *Pondexter v. State*, 942 S.W.2d 577, 583-84 (Tex. Crim. App. 1996).

"Same transaction contextual evidence" may be admissible if several crimes are intermixed, blended with one another, or connected so that they form an indivisible criminal transaction, and full proof of any one of them cannot be given without showing the others. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000); *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). An offense is not tried in a vacuum. *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id*.

Same transaction contextual evidence is admissible, however, only if the offense would make little or no sense without bringing in that evidence. *Wyatt*, 23 S.W.3d at 25. The

6

conduct must be blended or connected to the act for which the defendant is being tried so that they form an indivisible criminal transaction, such that full proof of one could not be given without showing the other. *See Buchanan v. State*, 911 S.W.2d 11, 15 (Tex. Crim. App. 1995) (citing *Mayes v. State*, 816 S.W.2d 79, 86 n.4 (Tex. Crim. App. 1991)); *Lam v. State*, 25 S.W.3d 233, 237 (Tex. App.—San Antonio 2000, no pet.).

The State, as the proponent of extraneous offense evidence, bears the initial burden of showing admissibility. *See Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996). The court's task is then to determine whether extraneous offense evidence is relevant for a purpose other than the propensity of the defendant to commit crimes or other bad acts. *Jones*, 119 S.W.3d at 419. The trial court's ruling on relevance will be reviewed for an abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993); *Corley v. State*, 987 S.W.2d 615, 618 (Tex. App.—Austin 1999, no pet.). Appellate courts should give great discretion to trial courts in evidentiary rulings, reversing only if the trial court acts outside "the zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391.

If a trial court determines that evidence of other crimes or extraneous misconduct has relevance aside from character conformity, and a timely, proper Rule 403 objection is made, the trial court must make the balancing determination called for in Rule 403. *Montgomery*, 810 S.W.2d at 388-89. Under Rule 403 relevant evidence may nevertheless be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Rule 403. Only "unfair" prejudice provides the basis for exclusion of relevant evidence. *Montgomery*, 810 S.W.2d at 389. Unfair prejudice arises from evidence that has an undue tendency to suggest that

7

a decision be made on an improper basis, commonly an emotional one. *Id.* In evaluating the trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial court is in a superior position to gauge the impact of the relevant evidence. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (citing *Montgomery*, 810 S.W.2d at 389).

When assessing the trial court's balancing determination, the appellate court considers: (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense; (2) the potential the extraneous offense evidence has to impress the jury in a rational but indelible way; (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the force of the proponent's need for this evidence to prove a fact of consequence. *Id*.

*Application*

Appellant argues that the evidence concerning the motorcycle accident should have been excluded as extraneous offense evidence because there was not adequate identification of appellant or his vehicle in connection with that accident. The State's theory of admissibility in this case is that appellant was involved in three similar accidents in a short time frame within a close geographical location. Therefore, the evidence about the motorcycle accident acted to rebut appellant's defense of accident or mistake, that is, he was intoxicated but had no intent to harm.

8

We first observe that this evidence is not the kind that has an undue tendency to suggest that a decision be made on an improper basis as highly emotional evidence. *See Montgmery*, 810 S.W.2d at 389. No deaths resulted from the motorcycle accident; in fact, the motorcyclist walked away and it was later discovered he was on a motorcycle that had been "hotwired" and reported stolen.

The three incidents occurred in a short period of time. Goodman had just arrived at the motorcycle hit-and-run scene when he received a call to go to the nearby parking lot where the appellant had already smashed into the Neon. The location and timing of the motorcycle wreck logically appeared to be a continuation of a sequence of events that started at I-35 and Slaughter Lane and ended at Ben White and Riverside. Goodman had just returned to the location of the motorcycle accident when he received a call notifying him that the blue Volvo had been located and appellant apprehended. All three accidents involved many similarities. An older model blue European car driving aggressively and recklessly appeared, without provocation, intentionally to collide with another vehicle and then left the scene. The Abbotts and the Castillos described appellant's demeanor as angry; he "shot the finger" and was yelling.

The facts concerning the motorcycle accident were relevant to the issue of appellant's intent, specifically to rebut his contention of mistake or accident. Appellant claimed his reckless driving was the product of intoxication, failure to wear glasses, and mechanical problems with his vehicle. The motorcycle accident evidence, when combined with the other evidence admitted at trial, rebutted this defense by showing a pattern of behavior during the course of what was essentially a single event or transaction. Further, as some of the same officers went from scene to scene, it would

9

have been difficult to describe completely the automobile accidents without describing the motorcycle accident.

Appellant complains that the evidence linking him to the motorcycle accident was weak. The strength or weakness of the identification is but one factor in the balancing analysis, to which we now turn.

One factor in the analysis is how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable, a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense. *See Mozon*, 991 S.W.2d at 847. In this case, weaknesses in the evidence presented by the State, such as one witness's description of the car as a "Volkswagen" rather than a Volvo, go to the strength of the State's evidence. The similarities in the description of the car as a dark blue foreign car and the closeness in time and location are all factors to be weighed. This factor appears neutral.

Another factor is the potential the offense evidence has to impress the jury in some irrational but nevertheless indelible way. *Id*. This factor weighs in favor of admission. The motorcycle wreck was simply one of three wrecks that were investigated at more or less the same time and were all part of a continuous event. As noted above, there was nothing particularly emotion-inducing about the evidence concerning the motorcycle wreck that would unfairly impress the jury.

The third factor is the time the proponent will need to develop the evidence, during which time the jury will be distracted from consideration of the indicted evidence. *Id*. This factor also weighs in favor of admission. The investigation of, and thus the testimony about, the three incidents was intertwined, as one officer was going back and forth between locations.

The fourth factor is the force of the proponent's need for the evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact. *Id*. The factor weighs somewhat against the admission of the evidence in that there was direct testimony going to appellant's intent; that is, the testimony that he appeared angry, was yelling, and was making obscene gestures.

Based on our review of the factors, we cannot say that the trial court abused its discretion in admitting the evidence of the motorcycle accident. *See Mozon*, 991 S.W.2d at 847. We overrule appellant's only issue.

**Conclusion**

We have overruled appellant's only issue and affirm the trial court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: June 29, 2006

Do Not Publish

11