# NO. 12-10-00110-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CARLTON JOHNSON,*<br>*APPELLANT* | § | *APPEAL FROM THE 2ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *CHEROKEE COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

A jury found Appellant, Carlton Johnson, guilty of possession of cocaine with intent to deliver, and assessed his punishment at imprisonment for forty years and a $10,000 fine. In thirteen issues, Appellant contends the deficient performance of his trial counsel deprived him of his right to effective assistance of counsel. We reverse and remand for a new trial on punishment.

### BACKGROUND

On April 25, 2009, the Jacksonville Police Department was informed that Appellant had been involved in a shooting, and that he was armed and in the KEBE Hill area of Cherokee County in a gray vehicle. Officers Allen and Shobert responded to the call and located the vehicle parked at 1007 Pierce Lane in the KEBE Hill area. The officers approached different sides of the house and attempted to talk to the occupants. Allen witnessed one person kick out a window screen and flee from the house. The person was immediately arrested. Then Allen saw Appellant running from the front of the house. Allen pursued Appellant. Shobert joined the chase in his patrol car and then continued the chase on foot until Appellant surrendered. In retracing their steps back to the patrol car, Shobert found a bank bag where he had seen Appellant fall during his flight. The bag contained

marijuana, cocaine, Xanax, a notebook, ammunition, scales, plastic baggies, and razor blades.

A DPS chemist testified that the substances recovered from the bag tested positive for cocaine, Xanax, and marijuana. Randy Hatch, a thirty-eight-year veteran in law enforcement, including five years with the Drug Enforcement Administration (DEA), testified that the contents of the bank bag were typical of those used in the sale of drugs. He testified that the entries in the notebook indicated drug sales, and that a comparison of the writing in the notebook and Appellant's handwriting indicated Appellant made the notebook entries.

During the punishment phase, both Allen and Shobert testified that Appellant was not peaceful or law abiding. Shobert testified that he had had many run-ins with Appellant. Appellant's counsel made no request for notice of the State's intent to introduce extraneous offenses, and filed no motion in limine or other pretrial motions. At the punishment phase, hearsay testimony admitted without objection linked Appellant to various unadjudicated offenses, including multiple aggravated assaults, retaliation against witnesses, and terroristic threats. Appellant had no felony or misdemeanor convictions and asked for probation. The State suggested imprisonment for thirty-five to forty years. The jury returned a verdict of forty years.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

In thirteen issues, Appellant contends that his trial counsel's representation was ineffective.

**Standard of Review**

The standard for testing claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted for Texas constitutional claims in *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986). To prevail on his claim of ineffective assistance, an appellant must show that his attorney's representation fell below the standard of prevailing professional norms, and that there is a reasonable probability that, but for the attorney's deficiency, the result of the trial would have been different. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000).

Our review of counsel's representation is highly deferential; we indulge a strong presumption that counsel's conduct falls within a range of reasonable representation. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Tong*, 25 S.W.3d at 712. This court will not second guess through hindsight the strategy of counsel at trial, nor will the fact that another attorney might have pursued a different

2

course support a finding of ineffectiveness. ***Blott v. State***, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979). That another attorney, including an appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance. ***Harner v. State***, 997 S.W.2d 695, 704 (Tex. App.–Texarkana 1999, no pet.). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. ***Thompson v. State,*** 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In order to render reasonably effective assistance, an attorney must have a firm command of the facts of the case and the governing law. ***Ex parte Welborn***, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); ***Ex parte Lilly***, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983). "It may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed rational decision." ***Welborn***, 785 S.W.2d at 393 (citing ***Ex parte Duffy***, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980)).

The record on direct appeal is normally insufficient to enable the appellate court to determine that counsel's representation was so deficient as to overcome the presumption that counsel's conduct was reasonable and professional. ***Mallett v. State***, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). Because the trial record was not developed for the purpose of preserving or litigating this claim, the record almost never speaks to the considerations behind the trial tactics the defendant's counsel employed. *See **Freeman v. State***, 125 S.W.3d 505, 506-07 (Tex. Crim. App. 2003). The Supreme Court has concluded, however, that "[t[here may be cases in which counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal." ***Massaro v. United States***, 538 U.S. 500, 508, 123 S. Ct. 1690, 1696, 155 L. Ed. 2d 714 (2003). The Court went further, adding that "[t]here may be instances, too, when obvious deficiencies in representation will be addressed by an appellate court *sua sponte*." *See **id***. Even a single error can render counsel's representation ineffective if sufficiently egregious and harmful to the defendant. ***Murray v. Carrier***, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986).

## **Applicable Law**

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d).

3

Hearsay may not be introduced directly or by inference. ***Schaffer v. State***, 777 S.W.2d 111, 114-15 (Tex. Crim. App. 1989). "[W]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly." ***Id***. at 114. So called "backdoor" hearsay is subject to the same rules and limitations as the classic form of hearsay. ***Gilbert v. State***, 874 S.W.2d 290, 295 (Tex. App.–Houston [1st Dist.] 1994, pet. ref'd).

## Issue One

Appellant maintains his trial counsel's representation was constitutionally deficient because counsel did not pose a hearsay objection to the following direct examination of the State's first witness:

> Q. Did you decide to go and back-up Officer Allen?
>
> A. Yes.
>
> Q. *Why was that?*
>
> A. It was a call of a man with a gun and we don't like to have a single officer show up to a call Like that?
>
> Q. Specifically, *what information when you set out to go respond or back-up Officer Allen, what information did you have?*
>
> A. That the subject was … had the gun had shot, fired shot earlier in the night and it was Carlton Johnson and he was driving a gray in color, I believe, they said a four door vehicle.

(Emphasis added). Appellant insists his trial counsel should have urged a hearsay objection to the questions emphasized.

The State is allowed to elicit testimony to establish the course of events explaining the officer's presence at the scene. ***Roberts v. State***, 743 S.W.2d 708, 711 (Tex. App.–Houston [14th Dist.] 1987, pet. ref'd). "The police officer, however, should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports on grounds that [he] was entitled to tell the jury the information upon which [he] acted." ***Schaffer***, 777 S.W.2d at 114-15.

Here, the prosecutor asked for more than an explanation of the officer's presence and conduct. The prosecutor was allowed to elicit, without objection, hearsay testimony of an unadjudicated

4

extraneous offense by Appellant involving a deadly weapon. Once in evidence without objection, the State repeatedly solicited testimony linking Appellant to this and other shootings. Counsel should have urged a hearsay objection to the officer's testimony.

## Issue Two

Appellant claims in this issue that his trial counsel's failure to object to nonresponsive answers and request an instruction to the jury to disregard the nonresponsive portions of the testimony constituted ineffective assistance of counsel.

Appellant complains that his trial counsel allowed Officer Shobert to testify in the narrative, which included nonresponsive testimony. For example, in response to the prosecutor's question, "What did you do then," the witness responded, "I have dealt with him [Appellant] on numerous occasions."

The State suggests that if trial counsel had objected to Shobert's narrative, the same information would have been elicited through a series of more specific questions and answers. It is also possible that counsel believed the information in Shobert's testimony less harmful buried in a lengthy response rather than emphasized by an objection. On this record, we are unable to say this was not a reasonable trial tactic.

## Issue Three

Appellant maintains that his counsel was ineffective in failing "to object to testimony regarding extraneous offenses and to request a limiting instruction regarding such testimony." Appellant's complaint apparently refers to the admission into evidence of the .22 caliber bullets found on his person and the marijuana and Xanax found in the bank bag with the cocaine. These offenses were inextricably connected to Appellant's cocaine possession. "[T]he jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). Trial counsel is not ineffective for failure to object to admissible evidence. *Cooper v. State*, 707 S.W.2d 686, 689 (Tex. App.–Houston [1st Dist.] 1986, pet. ref'd).

Trial counsel did not object to evidence of the outstanding traffic warrants, but, in final argument, used that evidence to provide an explanation for Appellant's flight from the police on the morning of his arrest. This was a reasonable trial strategy.

## Issue Four

5

Appellant claims his trial counsel was ineffective in allowing Officer Shobert to testify regarding the caliber of the ammunition found in Appellant's pocket, that the bank bag contained narcotics, and that the scales, baggies, and razor blades were commonly used in drug sales. Appellant contends his trial counsel should have conducted a voir dire examination of Shobert to test his qualifications to express these expert opinions.

Shobert was a certified peace officer with the Jacksonville Police Department for over eight years. Challenging Shobert's ability to recognize marijuana and .22 caliber bullets would have been senseless and dilatory.

## Issue Five

Appellant maintains that the State failed to provide appropriate and timely notice of the identity of the expert witnesses before trial. Therefore, he insists, his trial counsel's failure to object on this ground to the expert's testimony was ineffective assistance of counsel.

The two DPS chemists were listed in the State's witness list with the designation "DPS Forensics." The officers who testified were listed with the designation "JPD" (Jacksonville Police Department). The State's witness list adequately informed Appellant of the identity of the State's experts. The nature and purpose of their testimony was entirely predictable. There was no order under Texas Code of Criminal Procedure Article 39.14(b) or standing agreement requiring the State to file written notice of its experts. Trial counsel's failure to object on the ground urged by Appellant cannot be considered ineffective assistance because such an objection would have been overruled. *See* ***Wood v. State***, 4 S.W.3d 85, 91 (Tex. App.–Fort Worth 1996, pet. ref'd) (not ineffective assistance to forego making futile objections).

## Issue Six

In reference to Randy Hatch's testimony, Appellant complains that trial counsel "did not clearly articulate a ***Daubert*** objection so as to preserve the point for review." Randy Hatch, the district attorney's investigator, testified that the entries in the notebook found in the same bank bag as the drugs were "indicative of drug sales." Randy Hatch had thirty-eight years of experience as a peace officer. He had five of those years with the DEA. Given Hatch's experience, a voir dire examination as to his qualifications in the area of narcotic trafficking would have been superfluous.

Trial counsel did raise a timely objection to Hatch's testimony as to handwriting and obtained a running objection to Hatch's entire testimony regarding handwriting. We can imagine no trial

6

strategy that might explain trial counsel's failure to attempt to take Hatch on voir dire in order to explore his competency to make handwriting comparisons.

**Issue Seven**

Appellant complains that his trial counsel did not request a limiting instruction regarding the extraneous offenses. A limiting instruction regarding Appellant's possession of bullets, marijuana, and Xanax was unnecessary because the items were closely interwoven with the charged offense and constitute same transaction contextual evidence. *See **Martin v. State***, 780 S.W.2d 497, 500-01 (Tex. App.–Corpus Christi 1989, pet. ref'd) (citing ***Luck v. State***, 588 S.W.2d 371, 375-76 (Tex. Crim. App. 1979)).

The police dispatch report of Appellant's involvement in a shooting incident was hearsay evidence of a truly extraneous offense offered for no purpose but to show Appellant was a bad and violent person. In our discussion of issue one, we concluded that trial counsel's representation was deficient in not objecting to this evidence. Officer Shobert had already explained that he came to the scene to "back-up" Officer Allen. There was no legitimate purpose for the further explanation pointedly elicited by the prosecutor, "[t]hat the subject was … had the gun had shot, fired shot earlier in the night and it was Carlton Johnson. . . ."

**Issues Eight and Nine**

In issue eight, Appellant contends that during the punishment phase, his trial counsel repeatedly failed to urge an objection to evidence of serious extraneous offenses and gang membership that was subject to exclusion under the hearsay rule. In his ninth issue, Appellant insists his trial counsel was derelict in failing to object to evidence of extemporaneous offenses and to request an instruction regarding such testimony.

During the punishment phase, the State called Detective Travis Cearly who had investigated a shooting in which Jamail Bowens apparently had been the intended target. The following exchange occurred during direct examination:

> Q. And when you spoke specifically with Whitney McClelland *did you have an opportunity to find out if she had overheard any statements made by the Defendant in this case?*
>
> A. Yes, ma'am. Whitney had been in the Lincoln Park area with her sister and another friend. It was on a Sunday. Lincoln Park has, I think, a couple of basketball courts and stuff like that. It's a place where a lot of people congregate especially on Sunday afternoons and Sunday evenings. *And according to my interview with her, Whitney*

*heard Carlton Johnson, the Defendant here, tell Whitney's sister that he didn't have a problem with Whitney's brother but if he was in the car with Jamail or Willie, speaking of Willie Rogers, that he was going to get shot, too, that's what she specifically told me that she overheard.*

(Emphasis added).   Next, the prosecutor successfully attempted to explore Appellant's alleged gang leadership.

Q.      Now, Detective Cearley, are you aware of kind of the situation of what was going on between these groups over in that area at this time?

A.      *Like I said a few minutes ago, there has been so many cases involving Mr. Johnson that I am not sure as to specifically which one you're talking about.   I know he was involved in a rather large ordeal which was yet another shooting that was involved directly in the Lincoln Park area.*

Q.      I guess, Detective Cearley, what I am asking is not about a particular incident but are you aware of a feud that was going on between --

A.      And I don't know exactly what the background was behind it or why was there a feud, but, yes, there was definite tension between, I am not going to call it the Willie Rogers group, but a group of friends that Willie Rogers and some of them hung around as well as the Defendant here.   And whatever the feud was over there was several, several incidences that we had to investigate and respond to in reference specifically to shots being fired and threats being made of shooting people and things such as that.

(Emphasis added).   Then the prosecutor again revisited Officer Cearley's "awareness" to reinforce Appellant's responsibility for the assault on Jamail Bowens.

Q.      Okay.   I'm going to hand you State's Exhibit No. 14 and clarify as to what that particular item is?

A.      This is the recovered shell casing, spent .22 shell casing as well as what is labeled as one small lead fragment.   This was recovered at the scene of the shooting that Jamail Bowens was, I believe, operating the vehicle at the time of that shooting.

Q.      The one where he was the victim in the car?

A.      Correct.

Q.      That Mr. Johnson was shooting at him?

A.      Correct.

The cross examination of Officer Cearley by Appellant's counsel did not improve matters.

8

Q. So you have nothing directly linking Carlton with any of this?

A. *I do have witnesses in a case that heard him – heard him make statements prior to the shooting. There were then subsequent reports filed in reference to him making harassing telephone calls further stating that he was going to shoot people and/or their houses. Then there were subsequent witnesses that saw your client fire upon an occupied vehicle wherein shell casings were found. And then a subsequent case where an occupied residence was fired upon and the shell casings from that case, the ballistics report, came back consistent to the case where he was seen shooting a firearm. And in that matter – and in that manner is how your client was tied in with all these cases involving gun fire.*

(Emphasis added). During this questioning, trial counsel allowed the officer an uninterrupted opportunity to use hearsay without objection to tie Appellant to various assaultive offenses. His cross examination also elicited hearsay testimony of unadjudicated terroristic threats for the jury to consider in assessing Appellant's punishment.

Next, the State recalled Officer Price to testify as to what he had been told about Appellant's gang connections.

A. Through my investigation it's my understanding that one group of individuals confronted another group of individuals regarding this same feud that had been going on, a fight was challenged, and guns were withdrawn and people started shooting.

Q. Were guns drawn on both sides, I guess, of this feud?

A. Yes.

Q. Let's go back. You're talking about two groups feuding. Are you familiar with the North Side Bloods gang in Jacksonville?

A. Yes.

Q. *Are you familiar with whether or not the Defendant is a member of a gang?*

A. *It is my understanding that is he, the Defendant in this case, Mr. Johnson, is in fact or did at one time claim to be a North Side Blood, yes.*

Q. And as far as the two groups, any I guess group, there is generally kind of a leader or a head of the group; is that correct?

A. Yes.

Q. *And of these two groups who were the heads of the two groups?*

A. *Mr. Johnson would be considered the head of his group or at least the director that would make things happen.* On the other side would be – it was Willie Rogers and another individual, but Willie Rogers was basically the shot caller for the other side.

9

Q. Okay. *Were you able to determine if the Defendant in this case, Mr. Johnson, in fact had a gun with him that day?*

A. *Based on eyewitnesses, yes.*

Q. And were those eyewitnesses simply people involved in the case, I guess other offenders or were there any non-bias witnesses?

A. *Through my investigation I did speak to individuals who were involved on the other side of the incident who advised that Mr. Johnson did, in fact, have a weapon.* I also spoke with innocent bystanders or people who were actually at the park who also said that Mr. Johnson had a firearm that day.

(Emphasis added).

Other than excludable hearsay, the record contains no direct or circumstantial evidence of Appellant's gang membership. However, without objection, the State elicited from Officer Price hearsay testimony (based on his "investigation" or "familiarity") that Appellant was not only a gang member, but the gang leader of the North Side Bloods. The officer's testimony that Appellant was the leader of the local franchise of the most notorious African-American gang in the country was well calculated to poison the jury's attitude toward Appellant. Obviously relying on hearsay, Officer Price was then allowed to testify without objection about Appellant's threats to retaliate against those who might be witnesses to his crimes – crimes shown only by excludable hearsay.

Q. Now, Sergeant Price, in investigating this case did you encounter any difficulties with the witnesses wanting to come forward or give names or be formally involved in this investigation?

A. Yes, ma'am. *Not only did the individuals not want to give their names, some of their parents even contacted me and said I don't want my people, I don't want my family involved in this. The reason they gave for that was fear of retaliation from Mr. Johnson and/or members of his family.*

Q. And was retaliation a problem in regard to Mr. Johnson and his family and all these incidents that had been going on?

A. Yes, ma'am. *I worked a separate case that was directly related to this which was a retaliation case where Mr. Johnson's family directly retaliated against another young lady and expressed it was for her involvement in this case.*

Q. When you say involvement in this case do you mean cooperation with the police?

A. Yes.

(emphasis added).

10

Trial counsel for Appellant had a duty to object to harmful inadmissible evidence. Instead he repeatedly allowed the State, without objection, to use excludable hearsay to tell the jury about extraneous unadjudicated offenses said to have been committed by Appellant.

**Effect of Counsel's Failure to Object to Hearsay**

Appellant was eligible for probation. In such a situation, there is no reasonable trial strategy that would allow, without objection, hearsay testimony of multiple extraneous and unadjudicated assaults, retaliation against witnesses, and gang leadership of a notorious gang. Appellant's counsel himself, in cross examining Officer Allen, elicited hearsay evidence of Appellant's complicity in several terroristic threats.

But for trial counsel's failure to recognize or interpose any objection to hearsay, it is probable that the jury would have been unable to consider almost all of these extraneous offenses. Appellant admitted to a probation officer that he had used cocaine while released on bond. There was also direct evidence that he had hit an acquaintance with his fist. These were the only extraneous offenses alleged to have been committed by Appellant that were not proven by hearsay evidence subject to exclusion. Appellant's counsel raised one tardy hearsay objection during the punishment phase. The objection was sustained, but the damaging response was already before the jury.

The evidence of Appellant's guilt was overwhelming. Even if trial counsel's errors during the guilt-innocence stage of the trial can be considered so serious that he was not functioning effectively as counsel, we conclude that Appellant has not satisfied the second requirement of *Strickland* – that there is a reasonable probability that, but for his counsel's errors, the jury would not have returned a guilty verdict. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

Trial counsel's performance at the punishment stage mandates a different result. The performance of Appellant's trial counsel was not "within the range of competence demanded of an attorney in criminal cases." *See id*. His repeated failure to raise valid hearsay objections to evidence of otherwise unproven extraneous offenses "undermined the proper functioning of the adversarial process." *Id.*

The prosecution took longer in eliciting, without objection, hearsay evidence of myriad extraneous offenses during the punishment phase than in proving the charged offense during the guilt-innocence portion of the trial. Appellant was probation eligible since none of these offenses

11

had been proven in court.   In final argument, the prosecutor explained that Appellant had not been convicted of any of these crimes because the victims and witnesses were "too darned scared of him." The prosecutor described Appellant to the jury as not only a drug dealer, but as a violent, gun toting gangster.   The State suggested a sentence of thirty-five or forty years.   The jury assessed his punishment at incarceration for forty years.

We conclude that counsel's representation was so deficient that the trial on punishment "cannot be relied upon as having produced a just result." ***Id.***   Appellant has shown that his counsel's representation fell below "an objective standard of reasonableness," and that there is a reasonable probability that, but for the attorney's errors, the result would have been different.

We sustain Appellant's issues eight and nine.   In view of our disposition, we need not address Appellant's remaining issues.   *See* TEX. R. APP. P. 47.1.


## DISPOSITION

The judgment of the trial court is ***reversed*** with regard to punishment and the cause ***remanded*** for a new trial on punishment.


### BILL BASS
Justice


Opinion delivered May 11, 2011.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*


(DO NOT PUBLISH)


12