**Affirm and Opinion Filed August 27, 2013**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00479-CR**

**ANTWOIN DEWAUN BOYD, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F10-00650-I**

## MEMORANDUM OPINION
Before Justices Bridges, Lang, and Myers
Opinion by Justice Bridges

Appellant Antwoin Dewaun Boyd appeals from his conviction for murder and his accompanying sentence of 59 years' imprisonment and a $10,000 fine. In three issues, appellant argues: (1) the evidence is legally insufficient to support the conviction; (2) the trial court erred in admitting extraneous offense evidence; and (3) the trial court erred in not delivering disputed testimony to the jury in response to a jury note. We affirm.

### Background

Everette Jarvis was shot and killed outside his apartment on March 30, 2006. His girlfriend, Phyllissia Dudley, was also shot, but survived the incident. Dudley described Jarvis as the "bootleg" for the apartment complex, selling beer, cigarettes, and other items.

Dudley testified she had been at Francine "Lisa" Williams's apartment on March 30. Around midnight, she and Jarvis went to the store. When they got back, a man named "Marvin"

ran up to the car and told Jarvis "it's going down." When Dudley and Jarvis walked around the corner toward Jarvis's apartment, Marvin and appellant were standing by some bushes. As Dudley and Jarvis walked past appellant and Marvin, two gunshots were fired. Dudley identified appellant in court and in a photograph as the person she called, "L.A." As Dudley turned around, she saw appellant "take that last shot, that third shot" as he stood over Jarvis. Appellant then ran away, and Jarvis died.

Dudley testified appellant looked different the night of the shooting, noting he was skinnier and wearing black clothing. Because this incident took place over six years before trial, Dudley acknowledged she no longer remembered every detail.

When someone told her she was bleeding, Dudley realized she had also been shot. An ambulance took her to Parkland Hospital. While she was there, a detective attempted to talk to her, but she refused, stating she did not want to believe Jarvis was dead. A few hours later, Dudley described the two suspects to the police, and later identified a photograph of Marvin, whom she knew. Dudley did not remember being shown appellant's photograph in 2006 and did not recall much of her conversation with the officers, because she had been sedated with morphine. When Dudley did not identify appellant in a photograph shown to her a few days after the shooting, she explained it was because she was fully sedated and "going in and out." Dudley explained to the jury that identifying appellant was "a little fuzzy" for her, because she had only seen him one or two times. However, she stated she will never forget the way he looked.

Dudley testified she remembered things very clearly after she stopped taking medicine. Dudley did not know appellant or where he was from, and only learned his name was "L.A." from others. Dudley testified appellant's real name, Antwoin Boyd, kept circulating around the apartment complex, so she pulled up his picture on the Internet in 2010 and saw that he was "the right person," who committed the murder. In the photograph on the internet, appellant was biting

–2–

his lip the same way he did on the night of the shooting. Prior to that time, Dudley did not know appellant's real name.

She did not remember telling the police that the shooter was 5'7" tall, but remembered appellant's face and what he was wearing. Dudley had no doubt that appellant stood over Jarvis and shot him. Dudley stated, "[Y]ou can't forget somebody after they done hurt you."

Brandon Boney testified he was the night supervisor for security guards at Creekwood Village Apartments on March 30, 2006. Boney was standing at the front gates of the apartment complex when he heard gunshots. He went around the building and saw a black male with a bullet wound to his head, a black female who had also been shot and was on top of the man, and another black female standing nearby. There were several people who came around the area after the shots were fired. One black female told him that the shooter jumped over a fence into the parking lot on the north side of the complex. There were no security officers watching the fence on the north side when the gunshots occurred.

Dallas Police Officer Robert O'Conner testified that, on March 30, 2006, he received a shooting call around 12:30 a.m. After he arrived at the scene, O'Conner determined that the victim was already dead. O'Conner talked to people at the scene to try to get information about a suspect. Officers determined the suspect had gone over a fence leading out of the complex, about 40 yards from the victim's body.

Dallas Police Detective Junius Rucker testified that he was the crime scene detective, who processed the scene. Rucker collected three .380 cartridge casings that were all fairly close to the victim. No gun was recovered from the scene.

Dallas Police Detective Dale Lundberg testified he responded to the crime scene, interviewed a few witnesses, showed a lineup, and searched an apartment for a gun. Around 5:00 a.m. on the day of the shooting, Lundberg interviewed Dudley. Dudley gave a description

–3–

of the shooter, indicating he was wearing a black jacket. Dudley believed that the person who was with Marvin was originally from New Orleans. Later that day, Dudley told Lundberg that she was mistaken about the shooter being from New Orleans.

Francine "Lisa" Williams testified she was on probation in Georgia for fraud in obtaining public assistance and had been convicted of damage to property. Williams knew Jarvis and Dudley. Jarvis helped Williams start a candy store in the apartments, while Jarvis ran a bootleg operation and sold marijuana. Williams also knew Marvin, who spent time at Jarvis's house. Williams also knew appellant, who was known as "L.A.," and saw him regularly at the apartment complex.

On March 30, 2006, Jarvis and Dudley were at Williams's house and then went to the store. Williams had just talked to Jarvis, who said they were back from the store, when she heard a shot. Williams went out on her balcony, and she could see Jarvis's feet as he was lying on the ground by the bushes. Williams testified she saw appellant standing over Jarvis and saw appellant fire another shot. Appellant then ran toward a wooden fence beside the apartments. Williams testified Marvin was several feet away when appellant fired the shot. Williams affirmed that it was appellant, not Marvin, who had the gun.

As appellant and Marvin ran toward the fence, which was near Williams's apartment, she saw appellant hand Marvin the gun. Williams went back into her apartment and did not see them go over the fence. Williams did not leave her apartment until the ambulance and police arrived. Williams explained she did not tell the police that night what she had seen because she was scared.

Police officers talked to her the next day in the apartment manager's office. Williams explained Detective Trevino showed her a photograph of Marvin and a series of photographs containing appellant's photograph, which she identified as the shooter. Williams picked

–4–

appellant's photograph from the lineup on March 31, 2006. Williams confirmed that appellant was the person she saw shoot Jarvis. She stated the details of what happened were much fresher in her mind on the day after the offense than six years later during trial.

Williams did not talk to Dudley between the time of the shooting and the time she talked to police. Williams moved out of her apartment on the same day she talked to the police, because she was scared. Williams stated she identified appellant in the photographic lineup and in court, because that is who she saw standing over and shooting Jarvis.

Shakena Adams testified she dated appellant for eight years. Appellant was called "L.A.," which stands for "Little Assassin." Appellant's mother and his friends lived in the Creekwood Apartments, while Adams lived in a different complex. On March 30, 2006, appellant called Adams to pick him up from the apartment complex and take him to the store. On the way back from the store, Adams saw a gun on the passenger floorboard of her car, and it was not her gun. Adams had seen appellant carrying that gun the day before. Adams asked appellant about the gun, and he said it belonged to his friend Gutta. She explained that it upset her that appellant had a gun, and she "knew it was time to go because something wasn't sounding right and certainly wasn't looking right." Adams pleaded with appellant to give the gun back to Gutta, but appellant "blew it off." Adams left appellant at the apartments and did not witness the offense.

After midnight, appellant's mother called Adams looking for appellant and told Adams there was a man on the pavement with his brains hanging out. Later, appellant knocked on Adams's door. Appellant paced back and forth and said he "started to shoot [her] gas tank up," because she left the apartments. Adams stated appellant became angry and then started laughing, stating, "[Y]ou should have seen how I popped that n***er's brains out." Appellant told Adams

he shot "the bootleg guy." Appellant also said he shot a woman in the back, and her weave flew up.

Adams knew Marvin was friends with appellant. She testified appellant told her that he gave the gun to Marvin. Appellant said he and Jarvis had words when Jarvis and Dudley pulled up in their car. Appellant said when they walked past him, he shot Dudley first, shot Jarvis next, and then he walked over to Jarvis "and did one last shot." After giving the gun to Marvin, appellant said he then "hopped the fence."

Adams explained appellant's mother was moving the next day, and appellant made Adams go with him to help his mother pack. Adams saw the shooting on the news and was scared because appellant was "not locked up." When appellant's mother commented about where on her body Dudley was shot, appellant corrected her and said Dudley "got shot above the heart." When appellant's mother asked how he knew, appellant said nothing.

After appellant was arrested, he called Adams and said his alibi was that he was playing PS2 with her son; however, she stated appellant was not playing with her son at the time of the murder. Adams did not talk to appellant's lawyer about an alibi, because she did not want to sign a statement or commit perjury. Adams did not call the police about what appellant told her, because he was in jail and she felt "they got him," and she did not have to come forward.

In 2007, appellant came to Adams's house and began staying with her again. Adams then talked to an investigator and prosecutor with the District Attorney's Office, because she was scared with appellant out of jail. In August 2007, Adams gave the police a three-page written statement.

Dondrey Richard testified that he lived at the Creekwood Village Apartments in March 2006. Richard's nickname is "Gutta." Richard knew appellant as a friend and also knew Marvin. Richard sold drugs at the apartments, and Marvin bought crack from him. Richard did

–6–

not actually know Jarvis, but knew of him as the "bootleg guy."  About two or three days before this murder, Richard's gun went missing from his house.  Appellant was the only other person in Richard's house at the time. The gun was a 9 mm, loaded with .380 bullets.

On March 30, 2006, Richard was outside on his patio when he heard three shots.  A few seconds after the shots stopped, Richard saw appellant and Marvin running around the corner and through the breezeway.  Appellant was wearing a black Houston Astros jacket.  A man named "Freddy" knocked on Richard's door and said a man was dead "right here around the corner."  Freddy and Richard went around the back side of the apartments, because the police were in the front.  Marvin ran up to Richard and said, "Gutta, that was your gun. L.A. used your gun to kill that boy, but I got rid of your gun."  Marvin said appellant stole Richard's gun. Richard testified he saw a bullet casing on the ground that looked identical to the casings he had loaded into his gun.  Richard did not tell the police that his gun had been used, because it would have his fingerprints on it.

A few days after the murder, Richard and Freddy went over to appellant's girlfriend's house to pick up appellant and ride around. Richard testified appellant confessed he used Richard's gun. Appellant said Jarvis told appellant to get away from his house to sell dope, Jarvis's girlfriend then got into the argument, and then Jarvis and his girlfriend walked past appellant. Appellant said he began shooting when Jarvis gave appellant a "mean-mug style" and reached toward his shirt.  Richard could not remember exactly the order of the shooting, but thought appellant said he shot Jarvis first. When Jarvis's girlfriend got in the way, appellant shot her.  Then, appellant shot Jarvis again.

Richard did not ever get his gun back and did not want it back. Richard saw appellant again in the George Allen Building in February or March 2007, when they were both in jail. Appellant said he was "locked up for that murder" but they "ain't got no evidence," because

–7–

Marvin got rid of the gun. Appellant also said he was having nightmares about the night of the murder.

After Richard decided to straighten out his life, he talked to the Garland Police and then to Detective Lusty in Dallas County. Richard gave a videotaped interview to Detective Lusty and told him what he knew. On cross-examination, Richard admitted he also came forward because he was concerned the murder was committed with his gun. Richard did not ask for a time cut or any deal on his case in exchange for his information because he wanted to clean his conscience and give closure to the victim's family.

Dr. Reade Quinton, a medical examiner for Dallas County, testified he performed the autopsy on Jarvis. Jarvis had a gunshot wound on the left side of his head and a gunshot wound on the tip of his chin. The wound to Jarvis's head would have been immediately fatal. Jarvis's cause of death was gunshot wounds of the head, and the manner of death was homicide.

For the defense, Freddy Barnes testified he was on probation for possession of cocaine with intent to deliver. Barnes explained he was in a car with appellant and Richard a few days after Jarvis was killed, but denied that appellant confessed he had killed Jarvis.

Janice Boyd, the mother of appellant, testified that on March 30, 2006, she lived in the Creekwood Village Apartments. She heard three shots, looked out the window, saw one person lying on the ground, and saw another person running. She explained the shooting happened right behind her patio. Boyd saw Marvin, whom she recognized. Janice saw Marvin jump the fence and go by her apartment. Boyd did not see a second person with Marvin. After calling 911, Boyd called appellant on Adams's home phone. Adams answered the phone and then passed the phone to appellant. Boyd said she moved out of her apartment the next day, explaining she had given 60-days' notice that she was moving. Boyd never told the police that she saw someone else running after the shooting.

Appellant testified he did not shoot and kill Jarvis or shoot and wound Dudley. When appellant's mother called after the shooting, he was with Adams at her apartment. Appellant denied that he took Richard's gun.

Appellant testified he did not confess this murder to Richard or to Adams. Appellant stated he did not commit this murder. After he got out of jail, appellant went back to Adams, but about nine months later, he began seeing someone else. He explained that Adams would call the police about him, accuse him of family violence, and show up when he was with other people.

Appellant admitted he pleaded guilty to family violence in 2004, but claimed at trial he was falsely accused of family violence by Adams. When asked about his relationship with Richard, appellant said they did cocaine together. Appellant had seen Williams around the apartments but did not know her. He explained Williams used crack and Marvin was also a "crackhead." Appellant said he knew Marvin, but they were not friends. Appellant explained he did not know Jarvis, and had no conflict with him, but had seen him around. Appellant did not know Dudley.

Appellant stated he never carried a gun. Appellant admitted that his nickname was "Little Assassin," but claimed it was for music purposes only. Appellant testified that everybody was lying about his involvement in Jarvis's murder. Appellant said Williams lied when she said appellant was the shooter. Appellant said Dudley lied when she identified him in court as the shooter. Appellant said Adams lied, and Richard lied. Appellant admitted telling someone he was hoping for one juror to believe him, so he could get a mistrial.

### Analysis

#### 1. *Sufficiency of the Evidence*

In his first issue, appellant contends the evidence is legally insufficient to support his murder conviction, because the State failed to prove appellant committed the offense. In

reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality op.). We are required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326 ("a court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that appellant intentionally or knowingly caused the death of an individual. TEX. PENAL CODE ANN. §19.02 (b)(1). Here, Dudley testified Jarvis was the "bootleg," and she saw appellant "take that last shot, that third shot" as he stood over Jarvis. She explained when she pulled up appellant's picture on the Internet, she knew he was "the right person," who committed the murder. She said appellant was biting his lip in the photograph in the same way he did on the night of the shooting. Dudley explained she had no doubt appellant stood over Jarvis and shot him.

Williams testified that, from her balcony, she saw Jarvis's feet as he was lying on the ground. She saw appellant stand over Jarvis and fire another shot. Williams stated appellant then ran toward a wooden fence. She affirmed it was appellant, not Marvin, who had the gun and there was no question appellant fired the shot. As appellant and Marvin ran toward the fence, Williams stated she saw appellant hand Marvin the gun. Williams picked appellant's photograph from a photographic lineup.

–10–

Adams testified appellant was called "L.A.," which stands for "Little Assassin." She explained that, on March 30, 2006, appellant called Adams to pick him up. On the way back from the store, she saw a gun in the passenger floor board that was not hers. When Adams asked about the gun, appellant told her it belonged to Gutta.

Adams testified that appellant later knocked on her door. When she let him in, he became angry and started laughing, stating: "[Y]ou should have seen how I popped that n***er's brains out." Adams said appellant admitted to shooting the "bootleg guy" and that he shot the man's girlfriend. Adams further testified appellant told her he shot Dudley first, shot Jarvis next, and then he walked over to Jarvis "and did the last shot." Appellant told Adams he gave the gun to Marvin and "hopped the fence." Boney, the security officer, testified a black female told him the shooter jumped over a fence after the shooting. O'Conner also testified that witnesses told officers the suspect had gone over the fence about 40 yards from the victim's body. Adams also stated when appellant's mother talked about where Dudley had been shot, appellant corrected her, saying she "got shot above the heart." Adams further testified that, after appellant was arrested, he called her to arrange an alibi.

Richard testified his nickname was "Gutta," and he knew appellant as a friend. Richard did not know Jarvis, but knew of him as "the bootleg guy." About two or three days prior to this murder, Jarvis testified his gun–a 9mm, loaded with .380 bullets–went missing. Richard testified appellant was the only other person in his house at the time. When Rucker processed the scene, he collected three .380 cartridge casings close to the victim but was unable to recover the gun.

Richard testified that, on March 30, 2006, he heard three shots. A few seconds later, he saw appellant and Marvin running around the corner and through the breezeway. He said appellant was wearing a black jacket. Lundberg said Dudley told him the shooter was wearing a black jacket. Richard explained Marvin ran up to him and said, "Gutta, that was your gun. L.A.

–11–

used your gun to kill that boy, but I got rid of your gun." Marvin told Richard that appellant stole his gun. Richard saw the casings on the ground that appeared identical to the casings he had loaded into his gun.

Richard testified that, a few days later, appellant confessed he used Richard's gun. Appellant told Richard he began shooting when Jarvis gave appellant a "mean-mug look" and reached toward his shirt. Appellant said he shot Jarvis first, then Dudley, then Jarvis again. Richard never got his gun back. When Richard and appellant were in jail together, appellant told him that Marvin got rid of the gun.

When O'Conner arrived at the scene, he determined Jarvis was already dead. Quinton testified he performed the autopsy on Jarvis, who suffered a gunshot wound on the left side of his head and a gunshot wound on the tip of his chin. The manner of death was homicide.

On behalf of the defense, Freddy Barnes denied appellant confessed the murder to him and Richard. Boyd, appellant's mother, testified appellant was with Adams at the time of the murder, and she saw someone else running after the shooting. She never told the police she saw someone else running. Appellant also testified on his behalf, denying he shot and killed Jarvis. He also stated he was with Adams at the time of the murder. He further testified everyone was lying about his involvement in Jarvis's murder. Appellant admitted telling someone he was hoping for one juror to believe him, so he could get a mistrial.

When reviewing the record, we are required to defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 326. Having examined all of the evidence in the light most favorable to the verdict, we conclude the evidence was sufficient to convict appellant of murder. *See id.* at 319; TEX. PENAL CODE ANN. §19.02 (b)(1). We overrule appellant's first issue.

–12–

## 2. *Extraneous Offense*

In his second issue, appellant contends the trial court erred in admitting extraneous offense evidence that appellant used illegal drugs. Specifically, appellant complains Richard's testimony regarding appellant's use of "boy" (heroin) was "not necessary for the jury's understanding of the charged murder" and "did not assist the jury in determining whether the alleged offense occurred."

Rule 404(b) prohibits the admission of extraneous offense evidence to prove an individual's character in order to show action in conformity with that character. TEX.R. EVID. 404(b). This limitation is not based on legal relevance; rather, the evidence is inherently prejudicial, has a tendency to confuse the issues, and forces the accused to defend himself against uncharged crimes in addition to the charged offense. *Daggett v. State,* 187 S.W.3d 444, 451 (Tex. Crim. App. 2005); *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex. Crim. App. 1972). However, extraneous offense evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R. EVID. 404(b). These exceptions are not exclusive, and the proponent of misconduct evidence need not "stuff" a given set of facts into one of the laundry-list exceptions set out in Rule 404(b) for admission to be proper; he must, however, explain the logical and legal rationales that support admission. *See De La Paz v. State,* 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *De La Paz,* 279 S.W.3d at 343. As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Id.* at 344. A trial court's ruling is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue,

and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.  *Id.*  Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial court gave the wrong reason for its right ruling.  *Id.*

During the prosecutor's questioning of Richard, the following relevant exchange took place:

> Q. Okay. Six months to a year back around 2006. And tell me what type–I mean, would you consider [appellant] a friend, or what was y'all's relationship like?
>
> A. Yes, ma'am. He was a friend at the time.
>
> Q. Okay. And how close? I mean, would you hang out with him?
>
> A. I mean, yeah. We would hang out, you know, smoke weed, do powder, do music.
>
> Q. What?
>
> A. I said we would smoke weed, do coke, you know, just the normal things you do when you're, you know, hanging out.
>
> Q. All right. And back around March 30, 2006, was this defendant doing coke, powder, something called boy that you told me about?
>
> A. At the -- at the time, we was all doing it, yes, ma'am.
>
> [DEFENSE COUNSEL]: I'm going to object to that as being an extraneous offense. And it's not relevant at this time and not prudent at this time, Your Honor.
>
> [PROSECUTOR]: Your Honor, I'm referring to the day of the offense, and I do believe this witness does have knowledge of that.
>
> THE COURT: All right. Well, let's proceed on here.
>
> [DEFENSE COUNSEL]: If it's something extraneous, Judge, it has no relevance here.
>
> THE COURT: Overruled. Let's move on here.

–14–

The State argues the evidence of appellant's heroin use is relevant because it was same transaction contextual evidence. *See Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). Evidence of another crime, wrong, or act may be admissible as same transaction contextual evidence when several crimes are intermixed, blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony of any one of them cannot be given without showing the others. *Devoe v. State,* 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

The purpose of admitting extraneous evidence as same-transaction contextual evidence is to place the instant offense in context. *Nguyen v. State,* 177 S.W.3d 659, 667 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd). "[I]t has long been the rule in this State that the jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State,* 721 S.W.2d 295, 301 (Tex. Crim. App.1986). Circumstances of the offense that tend to prove the allegations in the indictment are not extraneous offenses. *Camacho v. State,* 864 S.W.2d 524, 532 (Tex. Crim. App 1993); *Ramirez v. State,* 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). But same-transaction contextual evidence is admissible as an exception under Rule 404(b) only when the offense would make little or no sense without also bringing in that evidence, and only to the extent that it is necessary to the jury's understanding of the offense. *Devoe,* 354 S.W.3d at 469. Here, however, we conclude appellant's alleged heroin use was not necessary to the jury's understanding of whether or not appellant committed murder. We, therefore, conclude its admission was error. *See* TEX.R. EVID. 404(b).

Because we have determined the trial court erred in allowing the evidence of appellant's alleged heroin use, we must next decide whether such admission was harmful. "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX.

–15–

R. APP. P. 44.2(b). A substantial right is affected when (1) the error had a "substantial and injurious" effect or influence in determining the jury's verdict or (2) leaves one in grave doubt whether it had such an effect. *See King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A substantial right is not affected and the error is harmless if, after reviewing the entire record, the appellate court determines that the error did not influence, or had only a slight influence, on the trial outcome. *Montez v. State*, 975 S.W.2d 370, 373 (Tex. App.—Dallas 1998, no pet.).

We first note that, prior to Richard's testimony about appellant's heroin use, Richard had testified to appellant's other drug use (marijuana and cocaine) without objection. We have also already determined that the evidence was sufficient to support the conviction without the evidence of appellant's alleged heroin use. Therefore, we conclude the error was harmless. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's second issue.

### 3. *Response to Jury Note*

In his third issue, appellant argues the trial court erred in not delivering to the jury all the disputed testimony in response to the jury's note. Specifically, appellant contends "the trial court erred in delivering to the jury only a portion of the disputed testimony requested in response to the jury's note, then delivering more of the disputed testimony only after the jury had reached a verdict, and, even then, not delivering to the jury all the disputed testimony."

When the jury asks that certain disputed testimony be re-read, the trial court must first determine if the jury's inquiry is proper under article 36.28. *Brown v. State*, 870 S.W.2d 53, 55. Article 36.28 provides in pertinent part as follows:

> In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other. . . .

TEX. CODE CRIM. PROC. ANN. art.36.28. If it is proper, the trial court must then interpret the communication, decide what sections of the testimony will best answer the inquiry, then limit the

–16–

re-reading accordingly.  *See Iness v. State,* 606 S.W.2d 306, 314 (Tex. Crim. App. 1980).  We do not disturb the trial court's decision unless a clear abuse of discretion and harm is shown. *Brown*, 870 S.W.2d at 55 (citing *Jones v. State,* 706 S.W.2d 664, 668 (Tex. Crim. App. 1986)).

In the case before us, the jury sent out a note, asking:

> When [Dudley] told the Detective about [appellant] biting his bottom lip.  Was it during her initial hospital interview with the Detective.  In 2006 or after?

That note was then crossed out and followed by another jury note:

> Certain jury members are in dispute regarding what point in time [Dudley] testified that the shooter was biting his bottom lip during the shooting incident.  We respectfully request [Dudley's] testimony on the point citing when she disclosed the lip-biting characteristic: whether it was in her initial statement provided to the detectives when she is [in] the hospital, or whether this fact was disclosed at a later point in time.

After the trial court received the note, the following exchange took place:

> THE COURT: . . .  We have a note that was file marked on April the 2nd at 2:06, and it requests the testimony of Phyllissia Dudley regarding the description of a lip.
>
> We have a proposed–the court reporter has gone through here and–notes. And we have a nine-page response, including all the certificates and cover page and everything.
>
> We believe that's all that's covered in the testimony direct, and it also includes redirect. But there's no–there's nothing in the transcript about–the record about anything on cross-examination. . . .

Defense counsel then objected on the basis the excerpt leaves a false impression with the jury that Dudley told the authorities about the lip-biting characteristic.  The trial court sent the first excerpt to the jury.  After sending the first excerpt of Dudley's testimony to the jury, the court later responded to the jury's note:

> With regard to your previous jury note, additional testimony was able to be located in the Reporter's Record.  I am now supplying you that additional testimony in the abundance of caution.  Please review it and after you have done so, return your verdict.

–17–

The jury returned a guilty verdict later that day. The following day, the court stated on the record:

> THE COURT: Before we bring the jury in outside the presence of the jury and with both parties here. Let me go over what happened with this note business yesterday.
>
> We first received a note from the jury about when [Dudley] told the detective about [appellant] biting his bottom lip.
>
> We sent a response back to that one, which was, Please–regarding your note, you have all the law and evidence. Please refer back to the Court's response to the jury's note regarding the testimony and continue your deliberations.
>
> Then about 2:06, we got another note, and we went ahead and answered that note. And that would be the response in Volume 1 of Volume 1 of the reporter's notes.
>
> And then just before–just before the jury–well, the jury did–the red light appeared, and the jury verdict was obtained. And the Court had it clocked in, but had not receive[d] it yet.
>
> Prior to it being received, our conscientious court reporter discovered an additional response to it, not on cross-examination, but on a recross of the witness regarding the defendant's lip, and so we sent that back in. And it's on the response that's dated–or timed in at 4:26. And that response was in Volume 2 of 2 volumes.
>
> And then, later that–at–the jury did return a verdict on–at 4:31, and it was received by the Court and checked in at that time, and it was the same verdict as it was before.
>
> But anyway, that–I just want to make sure that we have the sequence of events on this note business.
>
> So with that, let's go ahead and bring in the jury.

Our review of the record demonstrates the initial excerpt contained Dudley's testimony from her direct examination. In her testimony, Dudley identified appellant in court and testified regarding appellant "sucking his bottom lip" as he was standing next to Marvin. Dudley again said appellant was "sucking his lip" and "looked kind of strange" and "nervous or something." The second excerpt includes testimony from her redirect examination in which she described looking up appellant's picture on the internet. She indicated he was biting his lip in the picture

–18–

"the same way he was biting his lip the night that he shot [her]." In the further recross examination excerpt, Dudley testified she looked up appellant's picture on the internet in 2010. She again reiterated that she remembered appellant "sucking his lip."

In his brief, appellant argues "it is not feasible that the jury thoroughly reviewed and digested the totality of the second response." We disagree. The second excerpt provided testimony relating to Dudley recognizing appellant's picture on the internet because he was biting his lip in the same way he did at the time of the murder. However, Dudley recognizing appellant on the internet was not the issue about which the jury was in dispute. Rather, the jury stated their matter in dispute concerned "what point in time [Dudley] testified that the shooter was biting his bottom lip during the *shooting incident*." (emphasis added). The second response did not speak to the stated dispute. Thus, the timing of the second response was of no consequence. The lack of consequence was further evidenced by the lack of the change in the jury's verdict after the second excerpt was provided to them.

Finally, appellant contends by failing to provide the jury with the testimony of Dudley, regarding the "lip biting" and the timing of when she mentioned such characteristic to the authorities, the trial court abused its discretion. First, we note our review of the record demonstrates the trial court did provide the jury with Dudley's testimony regarding the lip sucking characteristic. Appellant also complains the trial court failed to provide Dudley's testimony regarding the timing of when she mentioned the characteristic to the authorities. However, our review of the record reveals Dudley never testified she revealed this information to the authorities. Therefore, such testimony could not have been provided to the jury in response to their note.

Based on the record before us, we conclude the trial court did not abuse its discretion in its response to the jury's notes.  *See Brown*, 870 S.W.2d at 55.  We overrule appellant's third issue.

Having overruled all of appellant's issues, we affirm the judgment of the trial court.


Do Not Publish
TEX. R. APP. P. 47
120479F.U05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

ANTWOIN DEWAUN BOYD, Appellant

No. 05-12-00479-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F10-00650-I.
Opinion delivered by Justice Bridges.
Justices Lang and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered August 27, 2013

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE